**OXFORD INDUSTRIES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 78–3–00389.**

United States Court of International Trade.

April 8, 1981.

---

George R. Tuttle, A Professional Corporation (George R. Tuttle and Stephen S. Spraitzar, San Francisco, Cal., at trial, Stephen S. Spraitzar, San Francisco, Cal., on the briefs) for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Joseph I. Liebman, Washington, D. C.,

Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Susan C. Cassell, at trial, Saul Davis, New York City, on the brief), for defendant.

RICHARDSON, Judge.

The merchandise in this case consists of one dozen long sleeve men's shirts (style 318) and one dozen short sleeve men's shirts (style 129) which were exported from Mexico, entered at Douglas, Arizona, and classified in liquidation under TSUS item 380.84 as other men's or boy's wearing apparel, not ornamented; not knit, at the duty rate determined in accordance with TSUS item 807.00. It is claimed by plaintiff that allowances in duty in accordance with item 807.00 should have been made for the collar band body and lining components and cuff body and lining components of the style 318 shirts, and for the collar band body and lining components of the style 129 shirts. The customs service had disallowed item 807.00 treatment for these components because they were subjected to a buttonholing operation in Mexico.

Item 807.00 provides for a duty upon the full value of the imported article, less the cost or value of such products of the United States of—

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

The record shows that the fabric and lining components in issue were cut to shape at the Woods Company in Douglas where, along with other components of the shirts not in issue, they were exported to Camisas Bahia Kino ("Kino") in Mexico across the border from Douglas for purposes of being assembled into shirts.

Woods and Kino were at that time wholly owned subsidiaries of the plaintiff corporation.

Of the eight witnesses who testified at the trial on plaintiff's behalf, three gave testimony relative to the making of the shirts in issue. Margot Ramos testified that she was product development manager for Manchester Shirts [one of plaintiff's subsidiaries] at Compton, California, since June 1974. She stated that during the period when these shirts were made in Kino she was in charge of the original patterns applicable to the shirts in issue. She said she made the original patterns listed on exhibit 2–A—the "make detail sheet" for the short sleeve shirt, and has made patterns for shirts similar to those in issue. The witness stated that she examined the imported merchandise. She testified to details of measurements she made of the buttonhole lengths.

James D. Faulkner testified that he was group manufacturing manager with plaintiff since January 1976, and also was supervisor of men's wear operations in Kino. He testified that at the time the shirts in issue were made he was the general manager for the Woods Company, and made daily visits to Kino. He said that his responsibilities included the training of personnel on the use of buttonholing machines, including the Reece S–2 buttonholer, and also the sewing of buttons on shirts.

Mr. Faulkner testified that after being cut in the United States the components in issue were bundled with an incentive ticket that has a sequential number for matching. These bundles were then shipped to Kino, and no work was performed on the components prior to entering the sewing operations.

Mr. Faulkner stated that after arrival at the Kino plant the bundles were placed in a storage rack, that when it came time to use them they were taken to the operators for the first sewing operation. He said that the Reece S–2 machine was used to make the buttonholes, and described the buttonholing operation. He stated that the machine sews the stitching around the button-

hole, and then automatically slits the material between the stitching with a knife in one continuous operation.

The witness also testified that the machine operator did not exercise any independent judgment relative to placement of buttonholes. He stated that he did not consider buttonholing to be an improvement in the condition of the shirt, but merely a necessary step in the completion of the garment.

Dale Drost, former head mechanic at plaintiff's Douglas plant, described the operation of the Reece S–2 machine. He said the Reece S–2 makes wide stitch rows, forms bars on each end of the buttonhole which are bold looking, and uses single thread chain stitch. According to the witness, the machine operates automatically when activated. It is activated by pushing a pedal which activates the sewing cycle that forms the stitching of the buttonhole. The first row of stitches is formed, and the first bar, then the machine is reversed to make the second row of stitches, and the second bar, after which the chopper knife automatically comes down to slit in between the two rows of stitches.

Mr. Drost stated that the Reece S–2 is a high-speed machine which does not remove any fabric. He characterized it as a "sewing machine," and said that it can be modified to perform other operations.

It was brought out in testimony of other witnesses called on plaintiff's behalf that the Reece S–2 machine is similarly used in other segments of the apparel industry. And, in this connection, although not involved in the making of shirts, the testimony of Robert Suszycki, the El Paso/Juarez area manager for White Stag, is illuminating. With respect to the relationship of buttonholing to other aspects of producing a garment, the witness testified (R. 418):

Q. In your opinion, is buttonholing a minor operation compared with other operations involved in producing a garment?—A. Stylistically, it is insignificant. Functionally, it is important. As a cost item, it is not important.

Q. Would you please explain that?—A. Well, in our particular products, if you compare the direct labor cost or whatever comparison you would like to draw, it is one of the cheapest, fastest, most automatic operation we have.

The garment to which the witness' testimony has reference was White Stag's basic slacks, style 44130, which was received in evidence as exhibit 31. Mr. Suszycki stated that the slacks were buttonholed either in El Paso or in Juarez. He said that the components joined together by the buttonholing was the waistband, which is in two pieces, and a fusible lining which is the third piece. And he pointed out that the buttonhole is added during the sewing operation.

This view of the witness Suszycki as to the minor nature of buttonholing was corroborated in the testimony of Samson Altman, director of manufacturing for Calvin Klein Jeans in El Paso, Texas, who was also called as a witness on plaintiff's behalf. Mr. Altman testified that buttonholing is a relatively minor operation compared with other operations involved in the assembly of garments. He stated that the time for buttonholing a collar band would be extremely fractional when compared with the stitching time for making a collar band.

Albert A. Dodds, an independent shirt consultant called as a witness on defendant's behalf, testified that while the cutting of the fabric (in the United States) with a knife or clicker was fabrication, the components (as exported from the United States) were not fabricated components because they were not then completed, lacking as they did the buttonholes. He characterized the addition of the buttonholes as creating a new element in the components which he regarded as being a *manufacturing* operation.

Mr. Dodds also testified that the length of time necessary to slit a buttonhole with the Reece S–2 machine which he considered to be a sewing machine was approximately the same amount of time it took to cut the thread. And he said that the sewing of the buttonhole normally takes place in the sew-

ing room of the shirt factory after the cuffs are made.

Plaintiff contends that the facts of record demonstrate that the components in issue met the requirements of item 807.00. Plaintiff argues (brief, p. 71), "The record herein clearly presents evidence that buttonholing does not substantially transform the buttonholed components, but is a minor or incidental operation." Defendant contends that the subject components are not entitled to item 807.00 treatment because they were subjected to further fabrication prior to assembly, and were advanced in value or improved in condition by operations other than assembly operations or operations incidental to assembly.

Defendant argues that "not only did the buttonholing operations complete the components in issue while abroad, they had a commercial and utilitarian function well after assembly of the components into the shirts." (brief, p. 55) Defendant further argues that "the only assembly which occurred abroad was the joining or sewing of the seams or sewing the buttons onto the cuffs and collar bands." (brief, p. 77) And, in this connection, defendant goes on to argue, "Operations as essential as the buttonholing operations involved in this case could not possibly be considered to be of such a minor nature as to term it incidental, when, without those operations the assembly can be completed, but the article would not be accepted by the customer or ultimate consumer." (brief, p. 79)

In *Rudolph Miles v. United States*, 65 CCPA 32, C.A.D. 1202, 567 F.2d 979 (1978), to which both parties call attention in the briefs, steel Z-beams were exported to Mexico where they were processed into floating center sills which were assembled into railroad box cars that were imported into the United States. Item 807.00 treatment for the Z-beams was disallowed by the customs service by reason of the fact that holes and slots of varying dimensions had been burned into each beam during the processing in Mexico. The Customs Court upheld the customs service' determination, and held that the burning of holes and slots in

the beams and other operations in Mexico constituted further fabrication within the meaning of clause (a) of item 807.00, and also advanced the value and improved the condition of the Z-beams within the meaning of clause (c) of item 807.00.

The court of appeals reversed the lower court's holding in *Miles*. The appellate court held that the processing of the Z-beams in Mexico, especially the burning of holes and slots, was concomitant with the assembly of center sills, and was not substantial enough to preclude qualification under clause (a) of item 807.00. The appeals court also concluded that the processing in Mexico was merely part of the assembly of the Z-beams into center sills, and "incidental to the assembly process" as provided in item 807.00(c). The court stated that all the operations in Mexico constituted assembly of the beams into center sills, and that if increase in value resulted from these Mexican activities, it was within the exception expressly provided in the statute for advance in value "by being assembled."

In *Mast Industries, Inc. v. United States*, 1 CIT ——, 515 F.Supp. 43 (1981), precut fabric components of women's pants were exported from the United States to El Salvador where they were assembled into finished garments that were imported into the United States. In El Salvador various fabric components of the pants were subjected to buttonholing (with a Reece S–2 machine) and pocket slitting operations. Upon entry into the United States the customs service disallowed item 807.00 treatment for these components by reason of these operations, and the importer instituted action in this court challenging the customs service' disallowance.

In *Mast* the court found that slitting the fabric for buttonholing and pocket insertion purposes, and the preliminary remedial sewing in the buttonhole area, were relatively minor procedures, and concluded that such operations were "incidental to assembly" of the pants, following *Rudolph Miles v. United States, supra*. Accordingly, the court held that *Mast* was entitled to item 807.00 treatment for the disputed components.

The facts in *Mast* and the arguments advanced in that case by the defendant parallel closely the facts and defendant's arguments in the instant case. In fact, so similar are the facts and arguments in the two cases, that the court is constrained to notice the inadvertent references by defendant's counsel on at least five occasions in the brief at bar when counsel referred to "pocket slitting" which was involved in the women's pants of *Mast*, while clearly intending to refer only to the men's shirts at bar (brief, pp. 62, 65, 67, 80 where there are two references), a point which did not go unnoticed by plaintiff's counsel (reply brief, p. 15). Consequently, the court agrees with plaintiff that the holdings in *Miles* and in *Mast* are dispositive of the issues at bar, and the court so holds. What the court said in *Mast* applies equally to the facts at bar, namely, "Said operations were not such substantial changes as to constitute further fabrication. No new portion of the [shirts] was made, and the cost of performing these operations, in terms of both labor and expense was a small portion of the total cost of assembly."

In view of the stipulations [1] of the parties, and admissions [2] made by the defendant, all of which are of record, nothing remains to be determined by the court. It follows, therefore, that plaintiff is entitled to the duty exemption accorded under item 807.00 for the disputed shirt components.

Judgment will be entered herein accordingly.

1. At the trial the parties stipulated:

   For the short sleeve shirts and long sleeve shirts in Exhibits 1–A and 1–B, the cost of adding the buttonholes is approximately equal to the cost of cutting the collar band components. * * * [F]or the long sleeve shirts, the cost of the four buttonholes in the two cuffs is slightly more than the cost of cutting six cuff components. * * * [F]or the short sleeve shirts and long sleeve shirts, the cost of adding the buttonholes to the sewn collar band is approximately 8 per cent of the cost of the collar band component. * * * [O]n the long sleeve shirts, the cost of adding the four buttonholes to the two cuffs is approximately 11 per cent of the cost of the six cuff components. [For each cuff, there are three components, the top and bottom components, and the lining.] [R. 174, 175.]
   [T]he range of the standard allowed minutes per dozen of adding one buttonhole on a Reece S2 buttonhole machine ranges from approximately a minute to a minute and a half. [R. 219.]

There is no specific requirement in Section 10.11 through 10.26, 19 CFR, no Customs Service rulings or no practice in the Customs Service of requiring that components be exported abroad together in order for the components of the assembled articles to receive an exemption under Item 807, provided that the other conditions of 807 are met. [R. 483.]

2. For purposes of this action defendant admits:

   12. The collar band shirt component, collar band lining components, cuff shirt components, and cuff lining components of the long-sleeved shirts did not lose their identity from the assembly process in Mexico by change in form, shape, or otherwise.

   * * * * * *

   27. The collar band shirt components and collar band lining components of the imported short sleeved shirts did not lose their identity from the assembly process in Mexico in change in form, change [sic], or otherwise.