The UNITED STATES, Appellant,

v.

OXFORD INDUSTRIES, INC., Appellee.

Appeal No. 81–21.

United States Court of Customs
and Patent Appeals.

Dec. 30, 1981.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Joseph I. Liebman, Attorney-in-Charge, and Saul Davis, New York City, for appellant.

George R. Tuttle and Stephen S. Spraitzar, San Francisco, Cal., for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is an appeal from the judgment of the United States Court of International Trade in *Oxford Industries, Inc. v. United*

*States,* 1 CIT ——, 517 F.Supp. 694 (1981), which sustained appellee's claim that the imported merchandise was entitled to a duty allowance for long and short sleeved shirt collar band components and long sleeved shirt cuff components under item 807.00, Tariff Schedules of the United States ("TSUS"). We affirm.

## BACKGROUND

The imported merchandise consists of men's long and short sleeved shirts. The shirt components were produced in the United States and shipped to Mexico for assembly. The present controversy centers on buttonholing operations performed on the cuff and collar band components in Mexico[1] by a wholly owned subsidiary of appellant. The collar band components are a front, a back, and a lining. The components of each cuff are a front, a back, and a lining. After assembling the collar band and cuffs, one buttonhole was added to the collar band and two buttonholes were added to each cuff.[2]

The buttonholing operation was performed in the sewing area of the factory by a machine which stitched and slit the cloth to form the buttonhole in one continuous operation; no fabric was removed by this process. Testimony established that the "standard allowed hours" factor ("SAH")[3] attributable to sewing five buttonholes (one on the collar band and two on each cuff) was 2.89% of the total SAH of sewing the shirt. The SAH attributable to the buttonholing operation on the collar band was 8% of the SAH attributable to the stitching time required for the collar band. The SAH attributable to the buttonholing operation on the cuffs was 10% of the SAH attributable to the stitching time required for the cuffs.

The parties entered into the following stipulation during the hearing before the Court of International Trade:

> For the short sleeve shirts and long sleeve shirts in Exhibits 1–A and 1–B, the cost of adding the buttonholes is approximately equal to the cost of cutting the collar band components. That is part one. Two, for the long sleeve shirts, the cost of the four buttonholes in the two cuffs is slightly more than the cost of cutting six cuff components. [Each cuff consists of three components: a front, back, and lining.] Three, for the short sleeve shirts and long sleeve shirts, the cost of adding the buttonholes to the sewn collar band is approximately 8 per cent of the cost of the collar band component. Four, on the

[1]. Buttonholes for the plackets of the shirts were formed in the United States and are not in issue.

[2]. The pertinent assembly steps performed in Mexico with respect to the collar band and cuffs for the long sleeved shirts are shown by Exhibit 20 as follows:

| Step | Operation |
|---|---|
| 1. | Shirt collar is assembled with collar lining by sewing. The assembly operations include Stay Sew, Run Collar, Clip Collar Points, Turn and Form Collar, Topstitch, and Miller Trim Collar. |
| 2. | The collar band is then assembled to the collar by sewing. The assembly operations include hem band, banding, turn band points, cord down band, trim and baste band, quarter notch, and button sew. (Quarter notch is done by burning the notch into the band). |
| 3. | A buttonhole is made in the collar band by the Reece buttonhole machine, and major label and size tab are sewn on. |

. . . .

| 8. | The cuff material components are assembled with cuff interlining by sewing. Each cuff consists of the |

two pieces of fabric and one piece of lining, which are precut to shape in the United States prior to exportation. The assembly operations include: (a) the lining of the cuff (sewing the lining to one of the cuff shirt components); (b) the running of the cuff (adding the other cuff shirt component and sewing along the other three sides); (c) the turning and forming of the cuff (turning the cuff assembly insideout and pressing with hot iron); and (d) top stitching.

| 9. | Two buttons are assembled to each cuff by sewing and two buttonholes are then added by the Reece buttonhole machine. |

. . . .

| 14. | Collar and collar band are assembled to neck opening of shirt body by sewing. |

. . . .

| 18. | Cuffs are assembled to ends of sleeves by sewing. |

Similar collar and collar band steps were employed with the short sleeved shirts.

[3]. This is a standardized cost-labor factor used by the trade in analyzing assembly operations.

long sleeve shirts, the cost of adding the four buttonholes to the two cuffs is approximately 11 per cent of the cost of the six cuff components.

The Customs Service classified the merchandise under item 380.84, TSUS,[4] and disallowed duty free treatment of the long and short sleeved shirt collar band components and long sleeved shirt cuff components under item 807.00, TSUS,[5] because these components were subjected to the buttonholing operations in Mexico.

The Court of International Trade agreed with appellee that the components in issue were exempt from duty under the provisions of item 807.00, TSUS, and stated that *Miles v. United States*, 65 CCPA 32, C.A.D. 1202, 567 F.2d 979 (1978), and *Mast Industries, Inc. v. United States*, 1 CIT ——, 515 F.Supp. 43 (1981), "are dispositive of issues at bar," adding that "What the court said in *Mast* applies equally to the facts at bar, namely, 'Said operations were not such sub-

stantial changes as to constitute further fabrication. No new portion of the [shirts] was made, and the cost of performing these operations, in terms of both labor and expense was a small portion of the total cost of assembly.' "

The government argues that the buttonholing operations were further fabrications required before the components could be considered complete, contrary to item 807.-00(a), TSUS, and were *not* incidental to the assembly process, contrary to item 807.00(c), TSUS.[6] According to the government, 807.-00(a) and (c) are separate and distinct requirements and must be separately considered; further, time and cost production comparisons apply only to an 807.00(c) determination. Item 807.00(a) was not satisfied, the government argues, because buttonholing was required to complete the garments prior to sale and, therefore, in order to possess commercial utility, the merchandise must be subjected to further fabrica-

---

**4.** Schedule 3—Textile Fibers and Textile Products; Part 6—Wearing Apparel and Accessories; Subpart F—Other Wearing Apparel, provides in pertinent part:

Subpart F headnote:

1. This subpart covers only wearing apparel not specially provided for, of textile materials.
. . . .

Other men's or boys' wearing apparel, not ornamented—
Of manmade fibers:
. . . .

| | | | | |
|---|---|---|---|---|
| 380.84 | Not knit ... | 25¢ per lb. +27.5% ad val | 45¢ per lb. +65% ad val. | |

**5.** Schedule 8—Special Classification Provisions; Part 1—Articles Exported and Returned; Subpart B—Articles Advanced or Improved Abroad, provides in part:

Subpart B headnotes:
. . .

3. <u>Articles assembled abroad with components produced in the United States.</u>—The following provisions apply only to item 807.00:
. . . .

(b) The duty on the imported article shall be at the rate which would apply to the imported article itself, as an entirety without constructive separation of its components, in its condition as imported if it were not within the purview of this subpart. If the imported article is subject to a specific or compound rate of duty, the total duties shall be reduced in such proportion as the cost or value of such products of the United States bears to the full value of the imported article.
. . . .

ITEM

807.00 Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart.)

**6.** The government notes that item 807.00(b) is not at issue.

tion.[7] Regarding 807.00(c), the government asserts that if a new "function or utility" results from the buttonholing operation which does not facilitate the assembly process, then "it is a fabrication and it cannot be incidental to the assembly process." Further, the government proposes that "if the cost and time analyses of the process in issue, when compared to the value of the component, discloses that it is substantial, e.g., it equals or exceeds the value of the component, then it is no longer 'incidental to the assembly process,' and it becomes a prohibitory advancement in value or improvement in condition." (Footnote omitted.)

Appellee stresses that the government has failed to defer to the language of the statute by arguing for a construction that is inconsistent with the express statutory language. It points out that there is no commercial utility requirement or "function and utility" test under item 807.00, TSUS; further, that here there was no preparatory processing of raw material before beginning the assembly process and, as such, the components were "ready for assembly without further fabrication" as required by 807.-00(a). Alternatively, appellee argues that 807.00(a) has been complied with because buttonholing is considered by the trade to be an assembly process. Regarding 807.-00(c), appellee argues that the evidence establishes that buttonholing is a minor operation which is incidental to the assembly

process and is one of the cheapest, fastest, and most automatic operations concomitant with the assembly process.

## OPINION

In support of its point that the buttonholing operation here was "further fabrication" for purposes of item 807.00(a), the government contends that fabrication "must mean a manufacturing or production operation, other than assembly, which creates something new that must be done before assembly can be completed," citing Zwicker Knitting Mills v. United States, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980), where the out-of-country finger tipping operation completed the glove components in issue. However, we are persuaded that the buttonholing operation here, unlike the tipping operation in Zwicker, was not necessary to enable the components to enter the assembly process. Indeed, as related above, the components of the collars and cuffs were sewn together before the buttonholing operation.[8]

As to item 807.00(c), we are further persuaded that the buttonholing operation was incidental to assembly of the collar and cuff components. Legislative history demonstrates the Congressional intent to permit duty-free treatment of a component manufactured in the United States if subjected to an operation "of a minor nature" occurring before, during, or after assembly.[9]

---

7. The government in its brief states: "The fact that is central to whether further fabrication occurs is whether the component upon which the process is being performed is complete, or was completed by the process."

8. In United States v. Mast Industries, Inc., decided on appeal concurrently with this case (slip op. 81–18), it was established that the involved buttonholing was a prerequisite to lining up the buttons to be sewn on the garment. That fact alone, however, was held to be insufficient to render the operation a "further fabrication" under item 807.00(a), TSUS. See also Miles v. United States, supra.

9. H.R.Rep.No.342, 89th Cong., 1st Sess. 49 (1965), states:
    The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the

assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other preservative coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or to paint or apply other preservative coatings. It may also be necessary to test and adjust the components. Such operations, if of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad. [Emphasis supplied.]

Here the buttonholing operation, which, with the buttons already in place, completed a closure device of the assembly, occurred *after* the collars and sleeves (with their buttons) had entered the assembly process, because it was necessary for the buttonholes to be lined up with the buttons to enable the assembled components to provide a proper fit.[10] We regard the buttonholing operation as "of a minor nature" considering both the cost and SAH factors relative to the collar and cuff components.[11]

█ In view of the foregoing, we hold that, for the purposes of item 807.00, TSUS, the collar band components and cuff components of the involved merchandise were exported in condition ready for assembly without further fabrication and were not advanced in value or improved in condition abroad except by operations incidental to their assembly.

The judgment of the Court of International Trade is *affirmed.*

**10.** We note that the Court of International Trade in *Mast Industries, Inc. v. United States,* 1 CIT ——, 515 F.Supp. 43 (1981), commented with respect to a similar buttonholing operation that "a judicious regard for proper alignment of the affected areas ... dictated the deferral of [the operation] until assembly ... rather than at some prior time."

**11.** As to the government's argument that the buttonholing was a "fabrication" because it was necessary to enable the involved merchan-

dise to possess commercial utility and resulted in a new "function or utility," we note that neither item 807.00, TSUS, nor its legislative history suggests such a test for determining whether an operation is a "further fabrication" or "incidental to the assembly process."

Cost, of course, is only one factor to be considered when making an 807.00(c) determination. Other relevant factors are delineated in the companion case of *United States v. Mast Industries, Inc., supra,* note 8.