**GENERAL MOTORS CORPORATION,
Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–
Appellant.**

**No. 91–1518.**

United States Court of Appeals,
Federal Circuit.

Oct. 8, 1992.

Rehearing Denied; Suggestion
for Rehearing In Banc
Declined Dec. 28, 1992.

---

Joseph S. Kaplan, Ross & Hardies, New York City, argued for plaintiff-appellee. With him on the brief was Michelle F. Forte, of counsel.

Saul Davis, Commercial Litigation Branch, Dept. of Justice, New York City, argued for defendant-appellant. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office. Also on the brief was Steven Berke, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, of counsel.

Before NIES, Chief Judge, ARCHER and MAYER, Circuit Judges.

MAYER, Circuit Judge.

The government appeals the judgment of the Court of International Trade, 770 F.Supp. 641 (1991), that certain motor vehicle components are eligible for the trade allowance provided in item 807.00, Tariff Schedules of the United States (TSUS), despite a contrary determination by the United States Customs Service. We reverse.

*Background*

During 1986 and 1987, General Motors Corporation (GM) manufactured in the United States various sheet metal components for use in the production of motor vehicles. These components were shipped to Mexico and assembled, along with other components, into finished vehicles in GM's Ramos Arizpe assembly plant.

The Ramos Arizpe assembly process is described as consisting of five operation groups: body shop, paint shop, chassis line, trim shop, and final process. In the first group, body shop, major component subas-

semblies are fitted together and spot welded to create the body of the automobile. In the second group, paint shop, the body is cleaned and sprayed with a protective zinc phosphate compound, submerged in an electro deposition primer tank, baked, sanded, treated with a sealant, and then baked again. This is followed by an application of surface primer. At this point, topcoat (finish) paint is applied and the body is oven cured. Finally the body is waxed and sent along to the trim shop.

In the trim shop, certain internal components are installed and water testing is performed. Next, in chassis, while the radiator, grille, and gas tank are attached to the body, the engine, transmission, and frame are independently subassembled on a separate conveyor. The body and frame are then joined, and the bumpers, radiator, and tires are installed. The last operation is final process wherein manual detail work, sundry inspections, wheel alignment, and final drive tests are performed. The finished vehicle is then reshipped to the United States for sale.

Upon the re-entry of the vehicles at issue here into the United States, GM sought a tariff allowance for the value of the sheet metal components manufactured in the United States, in accordance with item 807.-00, TSUS. Customs granted allowances on some of the components, but, in accordance with its regulation,* denied the allowance to components that had undergone topcoat (finish) painting, because:

Finish painting vehicle parts is not of such a minor nature as to be considered incidental to the main assembly process.... [F]inish painting amounts to a fabrication that advances the vehicles in value and condition, beyond the meaning of [item 807.00].

* 19 C.F.R. § 10.16 (1986), in relevant part, provides:

(c) *Operations not incidental to the assembly process.* Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly

After denial of its administrative protest, *see* 19 U.S.C. § 1514 (1988), GM filed suit in the Court of International Trade challenging Customs' denial of the trade allowance on the disputed components. *See* 28 U.S.C. § 1581(a) (1988).

On July 23, 1991, the court entered judgment in favor of GM, holding that the topcoat painting operations were minor and clearly subordinate to the assembly process and, accordingly, were "incidental to assembly" as required for item 807.00 treatment. 770 F.Supp. at 648. The court ordered Customs to reliquidate the entries and refund excess duties paid, with interest, to GM. *Id.* at 642.

## Discussion

Item 807.00, TSUS (1986), provides that:

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting [are subject to] [a] duty upon the full value of the imported article, less the cost or value of such products of the United States....

Accordingly, domestic components exported for assembly and reshipped to the United States, which conform to the requirements of each subpart of item 807.00, are eligible for a trade allowance upon re-entry in an amount equal to their cost or value.

and shall preclude the application of the exemption to such article. The following are examples of operations not considered incidental to the assembly as provided under item 807.00, Tariff Schedules of the United States (19 U.S.C. 1202):

\*　　\*　　\*　　\*　　\*　　\*

(3) Painting primarily intended to enhance the appearance of an article or to impart distinctive features or characteristics

....

In this case, there is no question that the disputed sheet metal components were exported in condition ready for assembly without further fabrication (807.00(a)) and have not lost their physical identity in the finished motor vehicles (807.00(b)). Furthermore, the components have "been advanced in value or improved in condition abroad" by the painting operations performed in GM's Ramos Arizpe assembly plant, as contemplated by 807.00(c). Therefore, in determining whether the components qualify for the item 807.00 trade allowance, the dispositive issue is whether the painting operations fall within the scope of "operations incidental to the assembly process such as cleaning, lubricating, and painting."

GM suggests that this issue can be resolved solely by the plain language of the statute. It contends that item 807.00 "expressly enumerates painting as an acceptable operation incidental to assembly ... [and] explicitly cover[s] the operation at issue here." We disagree. The statute's reference to "painting" is simply an exemplar of an operation which is potentially "incidental to the assembly process," not a definitive statement that all painting operations, no matter how extensive, are allowed under item 807.00(c). This interpretation is fully supported by the statute's legislative history, as set out in *United States v. Mast Indus., Inc.*, 668 F.2d 501, 505 (CCPA 1981)

> The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary ... *to paint* or apply other preservative coatings.... *Such operations, if of a minor nature incidental to the assembly process*, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

H.R.Rep. No. 342, 89th Cong., 1st Sess. 49 (1965) U.S.Code Cong. & Admin.News 1965, p. 3416 (emphasis added). Thus, contrary to GM's suggestion, the mere fact that the disputed operations involve painting does not resolve this appeal. Instead, we must focus on whether the operations are "incidental to the assembly process" within the meaning of item 807.00(c).

Whether particular operations are "incidental to the assembly process" has been at issue before. *See, e.g., Mast*, 668 F.2d 501; *United States v. Oxford Indus., Inc.*, 668 F.2d 507 (CCPA 1981); *Miles v. United States*, 567 F.2d 979 (CCPA 1978). In *Mast*, the court had to determine whether buttonholing and pocket slitting operations performed upon fabric components were incidental to the assembly of women's pants under item 807.00(c). After rejecting arguments that these operations were precluded merely because they provided "independent utility" or were not essential to the assembly process, the court concluded that "operations [such] as applying preservative coatings and testing and adjusting the components are incidental to the assembly process *'if of a minor nature.'*" 668 F.2d at 506 (emphasis added); *see also Oxford*, 668 F.2d at 510. As a means of ascertaining whether "an operation of a 'minor nature' is incidental to the assembly process," the court set out the following factors:

> (1) Whether [i] the cost of the operation relative to the cost of the affected components and [ii] the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered "minor." ...

> (2) Whether the operations in question were necessary to the assembly process....

> (3) Whether the operations were so related to assembly that they were logically performed during assembly.

*Mast*, 668 F.2d at 506. But because it identified these as "[r]elevant factors in this case," *id.*, we do not read *Mast* as announcing factors that must invariably be used to the exclusion of all others, or that

all such factors are pertinent in every case involving item 807.00. We believe "Congress intended a balancing of all relevant factors to ascertain whether an operation of a 'minor nature' is incidental to the assembly process." *Id.* We see this balancing process as an objective way to decide if particular operations are minor and incidental to assembly.

In applying the first part of the first *Mast* factor, the trial court said,

> The *Mast* court unambiguously stated that it compared the "cost of the [challenged] operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article." 69 CCPA at 54, 668 F.2d at 506.
>
> With reference to what operations are "challenged", there is no doubt that all of the operations performed in the paint shop are *not* at issue herein. Customs itself noted in its rulings that the preservative coating operations that make up the rest of the paint shop operations were in conformity with the spirit of item 807.00. Therefore, for defendant to now demand the use of cost and time figures of *all* paint shop operations when performing *Mast* comparisons is irrational. Only the figures directly attributed to the challenged finish painting operations will render a truthful computation of whether the operation is indeed of a minor nature.

770 F.Supp. at 645. The court was correct that Customs allowed GM a trade allowance on components that underwent preservative coating operations, but this appeal involves different components, those which were also subjected to topcoat painting, on which a trade allowance was denied. Accordingly, we believe that all coating operations performed upon the disputed components, including zinc phosphate, electro deposition primer, sealant, surface primer, sanding, baking, and waxing operations, are relevant and must be considered in conjunction with topcoat painting operations to determine if coating operations, collectively, are minor incidents to assembly. The piecemeal analysis adopted by the trial court undermines item 807.00 by al-lowing major and significant operations to be broken down to a point where each step could be called minor. The court focused on its finding that "the cost of topcoating is but a fraction, *i.e.* 14%, of the cost of the affected components." *Id.* at 646. But the appropriate cost comparison, encompassing all paint shop operations and using GM's own cost data, reveals that coating operations are nothing if not major.

In applying the second part of the first *Mast* factor, the trial court observed that "the time expended in the topcoating operations accounts for less than four [standard labor hours] out of a total assembly time of over thirty-nine [standard labor hours]." *Id.* This time comparison, like the cost comparison, improperly excludes relevant coating operations. Nevertheless, while the comparison of labor hours, or total time of the operation, undoubtedly is relevant in some cases, where the operations are complex and involve significantly automated or non-labor processes (such as baking), this factor provides little guidance on whether operations are of a "minor nature." It is entitled to little weight in this case.

On the remaining *Mast* factors, the trial court held that "[GM] has painstakingly demonstrated that for reasons of economics as well as design, the topcoating operation is most logically performed during the assembly process." *Id.* We see nothing wrong with this finding, but it does not save the case for GM.

The record demonstrates that GM's cost data on coating operations is significantly understated because its accounting methods do not fairly allocate the cost of paint shop equipment to the cost of the paint shop operations. Under GM's accounting methods, depreciation costs are allocated to each department on the basis of the standard labor hours expended in the department, not on the basis of the actual capital investment. Accordingly, this does not fairly allocate the real costs of equipment, notwithstanding that "this method of reporting time and cost is a standardized method in cost accounting for assembly operations" and is "authorized by GAAP," according to GM.

■ We therefore believe capital investment in paint shop operations, compared with investment in the assembly processes, is relevant in deciding whether the operations at issue are of a minor nature. GM's data shows that the capital investment in machinery and equipment in the paint shop is more than five times that in the body shop, where significant assembly operations are performed. In sum, proper application of the first *Mast* factor; and consideration of overlooked information, confirms that the paint shop operations are not within the scope of item 807.00(c).

### Conclusion

Accordingly, the judgment of the Court of International Trade is reversed.

### COSTS

General Motors Corporation shall bear the costs of this appeal.

REVERSED.

NIES, Chief Judge, dissenting.

This case involves sheet metal components manufactured by General Motors in the United States and shipped to Mexico where they and numerous other components were assembled into automobiles. Upon re-entry of the automobiles into the United States, General Motors sought to subtract the value of the sheet metal components made in the United States from the full value of the automobiles in calculating the duty owed for importing the automobiles under item 807.00, TSUS (1986). Item 807.00 permits such a duty allowance for components made here which:

(a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity ... by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

Item 807.00. The United States Customs Service denied allowances for sheet metal components which had been subject to topcoat painting operations in Mexico. The Court of International Trade disagreed and held that topcoating components in Mexico did not negate the deduction of the value of these parts as United States components. I agree.

The only question presented on appeal is whether the topcoated automobile components at issue have been advanced in value or improved in condition abroad by "operations incidental to the assembly process *such as cleaning, lubricating, and painting."* Item 807.00(c) (emphasis added). At the government's urging, the majority has looked to item 807.00's legislative history and the Court of Customs and Patent Appeals opinion in *United States v. Mast Indus.*, 668 F.2d 501 (CCPA 1981), to require that the painting operations in this case be *minor* in nature as well as "incidental to the assembly process."

Item 807.00(c) speaks of "operations incidental to the assembly process such as ... painting." Looking to this seemingly unambiguous language, the proper inquiry in this case is whether the painting operations performed in Mexico were "incidental to the assembly process." While the majority opinion states that painting is merely listed as "an exemplar of an operation which is potentially 'incidental to the assembly process,'" item 807.00's specific mention of painting is at minimum a strong indication that the type of painting in issue is the exact type of activity 807.00 was amended to allow.

The government and the majority opinion look to our predecessor court's opinion in *Mast* as support for the requirement that the painting be "minor in nature." The operations in *Mast* were buttonholing and pocket slitting performed on fabric, operations not specifically mentioned in 807.00. The court looked to 807.00's legislative history in order to determine whether these operations were "incidental to the assembly process" under item 807.00(c). Such a resort to item 807.00's legislative history is not necessary in the present case—the plain language of item 807.00 governs the proper inquiry. *See United States v.*

*Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981).

In any event, to the extent that it is necessary to look to legislative history in order to further illuminate this seemingly clear provision, 807.00's legislative history explicitly names incidental painting as an operation which does not negate a duty allowance for imported components. In connection with amending 807.00 to allow the performance of certain value enhancing operations abroad, the legislative history states, "It appears that under the language of [pre-amendment] item 807.00 *minor operations such as painting incidental to assembly* abroad may be precluded, and that in certain respects the item is ambiguous, with the result that it imposes undue administrative burdens on customs officers." H.R.Rep. No. 342, 89th Cong., 1st Sess. 48 (1965) U.S.Code Cong. & Admin.News 1965, p. 3416 (emphasis added). Even assuming, *arguendo*, that an operation must be minor in nature to allow a duty allowance, 807.00's legislative history clearly implies, if not directly states, that painting which is incidental to assembly is inherently a minor operation.

If there is any doubt as to where the proper inquiry lies it is dispelled by close examination of the following factors used by the *Mast* court:[1] (1) whether the cost of the operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered minor; (2) whether the operations were necessary to the assembly process; (3) whether the operations were so related to assembly that they were logically performed during assembly; and (4) whether economic or other practical considerations dictate that the operations be performed concurrently with assembly. 668 F.2d at 506 & n. 7.

The first factor focuses solely on the extent of the operations, *i.e.*, whether the operations are "minor in nature," and forms the basis for the majority's opinion.[2] Concededly, an operation's being minor in nature clearly impacts upon its being "incidental to the assembly process." A very minor operation is likely to be incidental to the assembly process. This factor, however, does not stand alone as dispositive; it is to be combined with the other three *Mast* factors and any other relevant considerations in determining whether an operation fits within those allowed under 807.00(c). The remaining three factors in *Mast* focus on the relationship between the operation and the assembly process in order to determine to what extent the assembly process dictated that the operation be performed abroad with the assembly. I believe these three factors lie at the heart of the inquiry in the present case.

The government suggests that the sheet metal components could have been painted in the United States and assembled in Mexico by "a nut and bolt assembly". This suggestion is so ludicrous I would have held the appeal frivolous. The process of nut and bolt automotive assembly became obsolete in the 1950's with the advent of spot welding. General Motors has clearly established that the painting operations had to be performed during the assembly process in Mexico. The components could not be painted (either undercoated or topcoated) prior to shipment to Mexico because the parts were assembled through electrical welding and the non-conductive paint would have, therefore, prevented assembly. The components could not be undercoated after the complete car was assembled because all of the sheet metal components must be undercoated in order

1. It is interesting to note that, in addition to item 807.00's plain language and legislative history, the judicial interpretation of 807.00 in *Mast* speaks of painting as an operation allowable under 807.00(c). 668 F.2d at 505.

2. In addition to the "cost of the operation" and the "time required by the operation" elements under the first *Mast* factor, the majority looked

to the amount of General Motor's capital investment in the machinery and equipment in the paint shop. I fail to see how the purchase of expensive capital equipment for whatever reasons, i.e., to increase efficiency, to cut labor costs, or to reduce employee's exposure to unsafe working conditions, changes the nature of the operation.

to prevent corrosion. Likewise, the sheet metal components could not be undercoated in Mexico and topcoated (a la Earl Schieb) after importation of the automobile because: (1) the windshields were attached by adhesives which bonded only to topcoat, (2) a delay in topcoating would increase ultra violet degradation of the undercoats, and (3) trim components would have to have been removed to paint all of the surfaces which need to be topcoated. The nature of the assembly process dictated that the painting operations be performed concurrently with the assembly of the car and, therefore, the painting operations conducted in Mexico were "incidental to the assembly process." Because of the denial of the deduction for these United States components, another part of the fabrication of automobiles in the United States will likely be lost. This cannot be the intent of Congress. Accordingly, I would affirm the judgment of the Court of International Trade.