CHRYSLER CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 92–01–00005–S

(Dated March 14, 1995)

*Barnes, Richardson & Colburn (Robert E. Burke, Donald J. Unger* and *Lawrence M. Friedman)* for plaintiff.

*Frank W. Hunger,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Saul Davis), Karen P. Binder,* Senior Attorney, Office of Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

OPINION

RESTANI, *Judge:* This matter is before the court for decision following trial. The issue is whether certain fabricated sheet metal components of automobiles and trucks, that were coated with finish paint in connection with assembly in Mexico, are entitled to duty-free treatment under item 9802.00.80 of the Harmonized Tariff Schedule of the United States

("HTSUS").[1] This issue was for all intents and purposes resolved in *General Motors Corp. v. United States,* 976 F.2d 716 (Fed. Cir. 1992), in which the predecessor statute was applied. *Id.* at 720–21 (finding finish coat painting operations for sheet metal components of automobiles not "incidental to the assembly process," and thus not entitled to duty exemption as American Goods Returned). There are no relevant differences in the current statute. Furthermore, the holding of the Federal Circuit in *General Motors* renders nondeterminative the factual distinctions established by plaintiff.

This matter is best explained by first describing plaintiff's assembly process, which is similar for both the Toluca car plant and the Lago Alberto truck plant in Mexico.[2] All of the components at issue were manufactured in the United States. In the initial stages of assembly, sheet metal components are welded together in the body shop. A metal finishing operation takes place to locate and detect any defects and to prepare the body for painting. The parties disagree as to whether metal finishing is part of the painting process. Although it appears more closely related to the painting process, resolution of this matter is not dispositive. The disputed processes all occur in connection with the paint operation. This begins with cleaning, a phosphate application to prepare the metal body for primer, some sealing, anti-chip coating application, baking, application of one or two color coats and a clear coat, followed by more baking.[3]

Following the painting operations, the body travels to the trim line where various trim components and subassemblies thereof are added to the body, such as instrument panels and window controls. Towards the end of the car assembly process, the engine and other essential components are mounted to the body. In the truck plant, the chassis is assembled separately and is joined with the trimmed body. Throughout the process various inspections take place and the entire assembly ends with final testing.

There is no dispute that the components at issue were exported in condition ready for assembly without further fabrication, that they have not lost their physical identity, and that they have been advanced in value or improved in condition. *See* Item 9802.00.80, HTSUS. Furthermore, as in *General Motors, see* 976 F.2d at 720, there is no doubt that the painting must be done after welding and before trimming, so

---

[1] The HTSUS provides in pertinent part:

9802.00.80    Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting.

HTSUS, USITC Pub. 2232, sec. XXII, ch. 98, subch. II, item 9802.00.80 (Supp. 2 1990); *id.,* USITC Pub. 2030, sec. XXII, ch. 98, subch. II, item 9802.00.80 (Supp. 4 1989).

[2] As part of the trial of this matter, the court viewed both assembly operations located in Mexico. The models involved are the K-body car (Dodge Aries, Plymouth Reliant), the Chrysler LeBaron, the Dodge Ramcharger and the Dodge Clubcab. The last two are assembled at the Lago Alberto plant.

[3] The sealing operations observed by the court appear more related to the assembly process than to painting, but the parties did not discuss this distinction.

that the painting operations are clearly an essential part of the assembly process.[4] Thus, the question that remains, according to *General Motors,* is whether the painting process as a whole is of a "minor nature." *Id.*

Plaintiff cannot succeed in this matter because, in relation to auto assembly, the *General Motors* court found two factors dispositive: (1) comparison of the cost of painting operations to the cost of the affected components, and (2) comparison of investment in painting operations to the investment in the body shop. *See General Motors,* 976 F.2d at 720–21. Those factors are not in plaintiff's favor here. First, the painting process as a whole accounts for between 30 and 40 percent of the total cost of the affected components[5] and the capital investment in paint shop operations is substantial in comparison to body shop investment. While paint investment is not five times greater as it was in *General Motors,* 976 F.2d at 721, paint investment still equals or exceeds that of the body shop. *See* Pl.'s Ex. 18. Under these criteria, painting operations at the Mexican assembly plants are not of a minor nature.

Plaintiff raises another issue that was not discussed in *General Motors,* but was an issue in that case as well. Under 19 C.F.R. § 10.16(c) (1990), examples of dutiable operations considered by Customs not to be "incidental to the assembly process" include painting operations primarily intended to enhance the appearance of an article.[6] Thus, here Customs did not duty components which were primed, but not finish coated. Plaintiff argues that the entire painting process is a preservative paint system and is not dutiable under the regulation.[7] The court agrees that plaintiff established at trial, through the testimony of Dennis P. Coleman, that approximately 70 percent of the entire paint system for both Mexican plants is intended primarily for preservative purposes.[8] As to the top coats, it is impossible to separate their appearance-enhancing features from their preservative functions. Indeed, any preservative coating, like most painting, is intended to maintain both structural integrity and a more superficial appearance. Besides providing sealing, the top coats contain ultraviolet absorbers and free radical scavenger substances to prevent the breakdown of the underlying anti-corrosives, according to the testimony of Dr. Clifford Schoff. Nonetheless, plaintiff cannot succeed. Under *General Motors,* the question still remains—is

---

[4] Painting must take place after welding to avoid disruption of the anti-corrosive paint film by the welding process. Painting also cannot be performed at the end of the assembly process because, among other problems, baking would warp or melt various parts. In addition, there would be a loss of anti-corrosive coverage of the substrate.

[5] *See* Def.'s Ex. U. The court finds defendant's Exhibit U more accurately reflects the cost of painting in comparison to the affected components than does any part of plaintiff's Exhibit 18. Even granting plaintiff's arguments on metal finishing some credence, it is unlikely that the painting to body shop percentages would fall below 25%. *See id.* and testimony of Efraín Pena as to percentage changes to plaintiff's figures, adjusting for defendant's view of metal finishing.

[6] Under 19 C.F.R. § 10.16(b), preservative painting is an example of a non-dutiable operation, when performed as part of the assembly process.

[7] *General Motors,* 976 F.2d at 720, directs that to qualify for duty-free treatment, the entire advancement by the coating operations is to be considered, not simply the top coats.

[8] Contrary to defendant's contention, Customs' prior factual findings are entitled to no weight. Actions under 28 U.S.C. § 1581(a) (1988), such as the case at hand, are tried *de novo.* 28 U.S.C. § 2640(a)(1) (1988); *see ITT Corp. v. United States,* 24 F.3d 1384, 1389 (Fed. Cir. 1994); *China Diesel Imports, Inc. v. United States,* 855 F. Supp. 380, 385 (Ct. Int'l Trade 1994).

the entire painting process of a minor nature.[9] In order to apply *General Motors,* the regulation must be read as qualified by this test. Accordingly, even though a painting process has an overall preservative purpose, it will be dutiable if it is not "minor" in terms of the cost comparisons found determinative in *General Motors.* As indicated, the cost of the painting and the investment involved are not minor in relation to the cost and investment for the affected components.

Having arrived at this conclusion, the court notes that this approach raises several concerns that are pointed out by the dissent in *General Motors. See* 976 F.2d at 721–23. Painting operations that are such an integral part of the assembly process, as the painting processes at issue here, may have been intended by Congress to be found "incidental to assembly." *Id.* at 722. The plain terms of the statute support such a reading and Congress may have intended to draw a clearer line than the courts are recognizing.[10] The result of such a line would be a more administrable statute and fulfillment of the Congressional intent to promote use of U.S.-made components in assembly abroad.[11] In this case, auditors for each side performed studies requiring approximately 700 hours each in an attempt to determine if the painting operations were of a "minor nature," a somewhat nebulous test.

The *General Motors* court found sub-tests measuring the value or cost of painting operations in comparison to the entire assembly of the imported article, tests that largely favor the assembler, to be of "little weight." *See* 976 F.2d at 720 (discussing specifically time and labor comparisons).[12] The tests chosen in *General Motors* for this product do not favor plaintiff. Why the tests relied upon in *General Motors* are particularly determinative as to painting operations that are integral to assembly is not clear to the court. Cases such as *United States v. Mast Indus., Inc.,* 668 F.2d 501 (C.C.P.A. 1981) (buttonholing and pants pocket slitting operations), and *United States v. Oxford Indus., Inc.,* 668 F.2d 507 (C.C.P.A. 1981) (buttonholing operation), in which various cost comparison tests are set forth, and which the *General Motors* court found applicable, *see* 976 F.2d at 719–20, may not in actuality provide much guidance, as they do not treat "cleaning," "lubricating" or "painting" processes, as set forth in the statute.

---

[9] The court rejects defendant's argument that because substantial corporate time is spent on the marketing issues involving color choice, painting operations are not minor. Marketing issues affect the entire automobile, including the shape of the affected sheet metal components. There was no evidence on the amount of marketing effort spent on non-painting elements. Thus, no comparisons are possible as to marketing.

[10] The court notes that the legislative history is more ambiguous and is not inconsistent with the *General Motors* interpretation. *See* H.R. Rep. No. 342, 89th Cong., 1st Sess. 49 (1965). The *General Motors* majority adopts the word "minor," which is found in the legislative history, and makes it part of the statutory test. The dissent focuses only on the statutory term "incidental," and its meaning as subordinate or occurring as a consequence of, although the word "incidental" has several meanings, including "occurring as a minor concomitant." *Webster's Third New International Dictionary* 1142 (Philip Babcock Gove et al. eds., 1981).

[11] Customs' regulation is directed towards establishing a clearer test. "Painting" in the statute, however, is not defined as "non-decorative preservative painting." *See* Item 9802.00.80, HTSUS; *see also* 19 U.S.C. § 1202 (1988). Thus, to this court, the regulation appears to be inconsistent with the statute, and would be entitled to no deference. Of course, the regulation may be inconsistent with the statute, as interpreted by *General Motors,* if it exempts all "preservative" painting, no matter how costly. 976 F.2d at 719–20.

[12] By some measures, the cost of painting operations was less than 5 percent of the total cost of the imported vehicle. The painting percentage for the Dodge Clubcab was slightly higher. *See* Pl.'s Ex. 18 (cost breakdown by vehicle type).

Judge Nies, in dissent in *General Motors,* indicated that if a painting operation must be done as an integral part of the assembly process, it is incidental to assembly and the affected components are not dutiable. 976 F.2d at 722–23. This is an appealing interpretation of the statute, for the reasons set forth, but it is not the current law. Accordingly, judgment is rendered in favor of defendant.