**Slip Op. 02-130**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                 :

DAIMLERCHRYSLER CORPORATION,   :
                                   :

                Plaintiff,          :

                                    :

                v.                :       Court No. 99-03-00178

                                    :

UNITED STATES,                    :

                                    :

                Defendant.      :
_____:

[Judgment for Defendant.]


                                       Dated: October 25, 2002

Barnes, Richardson & Colburn (Lawrence M. Friedman, Harvey Karlovac and Robert F. Seely), for plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General, John J. Mahon, Attorney-in-Charge, International Trade Field Office, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice (Saul Davis and Aimee Lee), Karen P. Binder, Office of Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

## OPINION

**RESTANI, Judge:**

This matter is before the court for decision following trial. The court previously opined that material facts were at issue as to whether the painting of truck bodies after assembly in Mexico disqualified the imported Model Years 1993 and 1994 pickup trucks from a duty exemption for United States manufactured parts pursuant to subheading 9802.00.80 of the Harmonized Tariff Schedule of the United States ("HTSUS") (codified at 19 U.S.C. § 1202 (1994)) and 19 C.F.R. § 10.16 (1999). See Daimler Chrysler Corp. v. United States, No. 99-03-

00178, Slip Op. No. 00-124 (Ct. Int'l Trade Sept. 29, 2000).  Familiarity with that opinion is

presumed.  For ease of reference, an appendix is attached containing the two principal provisions

of law applicable to this dispute.

## BACKGROUND

As a preliminary matter, defendant requests remand to the United States Customs Service

("Customs") in order for it to provide a comprehensive interpretation of its regulations.  Given

the long history of the auto painting wars[1] and the existence of the applicable regulation since

1975, see 40 Fed. Reg. 43023 (Sept. 18, 1975), defendant should have requested such relief

before trial.  Furthermore, the words of the regulation itself are not unclear, they are merely

difficult to apply to these particular facts.

Under HTSUS subheading 1902.00.80, operations "not incidental to the assembly

process" disqualify U.S. manufactured parts assembled abroad from the otherwise applicable

duty exemption.  The issue before the court is whether, under the applicable regulation, the two

top paint coats, a base color coat and a clear coat, are "primarily intended to enhance the

appearance of" or "to impart distinctive features or characteristics" to the truck bodies at issue.

See 19 C.F.R. § 10.16(c)(3) (providing examples of operations not incidental to assembly).

Conversely, "application of preservative paint or coating" is an example of an operation

incidental to assembly, which maintains the exemption.  See 19 C.F.R. § 10.16(b)(3).  The court

has determined that it should not resort to the ambiguous general introductory language of 19

C.F.R. § 10.16(c) defining "not incidental" processes ("any significant process, operation, or

---

[1]See, e.g., General Motors Corp. v. United States, 976 F.2d 716 (Fed. Cir. 1992); Chrysler Corp. v. United States, 19 CIT 353 (1995), aff'd, 86 F.3d 1173 (Fed. Cir. 1996) (unpublished).

treatment other than assembly whose primary purpose is the . . . completion . . . of a component . . . .") , or even to 19 C.F.R. § 10.16(c)(5) (relating to processes imparting new characteristics or qualities) unless it cannot resolve this matter on the basis of 19 C.F.R. § 10.16(b)(3) and § 10.16(c)(3), the provisions of the regulation addressing "paint." As Customs published specific provisions indicating how painting and coating should be treated under the relevant HTSUS subheading, those specific provisions control. Resort to a more general test risks reversion to standards not unlike the discredited "Mast" factors. See United States v. Haggar Apparel Co. 526 U.S. 380, 393 (1999) (abrogating test enumerated in United States v. Mast Indus., Inc., 668 F.2d 501, 505 (Fed. Cir. 1981), which provided a variety of quantitative factors for determining what is a minor process incidental to assembly).

## FINDINGS OF FACT

The following facts are uncontested:

l.      Protest numbers 2304-93-10006, 2304-93-100117, 2304-93-100317 were timely filed.

2.      Chrysler Motors Corporation ("Chrysler"), now DaimlerChrysler Corporation, was the importer of record for the entries covered by the protests.

3.      On September 29, 1998, Customs denied the protests in full.[2]

4.      The merchandise at issue consists of Model Year 1993 and 1994 Chrysler pickup trucks produced by Chrysler de Mexico.

5.      The cargo boxes for the vehicles were produced at the Pemsa plant at Celeya, Mexico, in part from U.S.-origin stamped sheet metal components.

---

[2] Suit was timely filed challenging the protest denials, pursuant to 28 U.S.C. § 1581(a) (1994).

6.   The vehicles were produced at Lago Alberto, Mexico, in part from U.S.-origin stamped sheet metal components.

7.   The cab and cargo boxes were subjected to a painting process that consisted of the following operations:

   a.  cleaning and rinsing
   b.  application of zinc phosphate
   c.  application of a spray prime to cab
   d.  application of an electrodeposition primer to cargo box
   e.  application of a color coat
   f.  application of a clear coat

8.   The primary purpose of primer coat is to prevent corrosion of the sheet metal.

9.   Each vehicle was offered to consumers in approximately 10 to 12 color choices.

10.  PPG Industries was the sole supplier of primer and paint to the Pemsa and Lago Alberto plants for application to sheet metal body components.

11.  The selection of colors to offer to consumers was made by the Product Design Office at Chrysler World Headquarters in Michigan.

12.  The Director of the Product Design Office is currently Margaret L. Haackstedde.

13.  Chrysler Market Research personnel do not conduct or sponsor research on consumer color preferences.

14.  For the vehicles at issue, Chrysler warrantied the sheet metal to be free of rust perforation for 36 months and unlimited mileage for any body sheet metal panel, and seven years or 100,000 miles, whichever occurs first, for outer-body sheet metal panels for the 1993 and 1994 model years.

15.  Chrysler includes a group known as Paint Materials Engineering.

16.     Paint Materials Engineering is responsible for the development and enforcement of materials standards for materials used in the production of Chrysler motor vehicles.

17.     Thomas J. Bjelica was a Grade A Engineer in 1993, the senior engineer in 1994, and is currently supervisor in the Paint Materials Engineering Group.

18.     During production of the vehicles at issue, Chrysler maintained and enforced materials standards for primer coat, color coat, and clear coat.

19.     No prime, paint, or clear coat may be employed in production at any plant, including Lago Alberto, unless that material meets the relevant materials standard.

20.     Chrysler required PPG to perform tests to determine that the materials met the relevant standards.

21.     All of the coatings used on the vehicles at issue met the relevant Chrysler materials standards.

22.     No process existed to waive application of the materials standards.

23.     Relevant characteristics included in the materials standards were, but not limited to:

> a. Hardness
> b. Hiding
> c. UV transmissivity
> d. Chip resistance
> e. Scratch resistance
> f. Adhesion to the substrate
> g. Gloss
> h. Distinctness of Image

24.     Hiding is a measure of the ability of the coating at a particular film thickness to hide patterns in the underlying substrate.

25.     UV transmissivity is a measure of the ability of the coating to prevent the transmission of

ultraviolet radiation to the substrate.

26.    Chip resistance is a measure of the ability of the coating to withstand damage from impacts by small rocks and similar objects.

27.    Scratch resistance is a measure of the ability of the coating to withstand lateral impacts along a surface.

28.    Adhesion is a measure of the ability of the coating to remain affixed to the substrate to which it has been applied.  The substrate may be metal, prime, or base coat paints.

29.    Gloss is a measure of the reflected light from the coating surface.

30.    Distinctness of image ("DOI") is a measure of the quality of the reflected image in a coated surface.

31.    Gloss and DOI are characteristics relating solely to the appearance of the coated surface.

32.    Hardness, UV transmissivity, chip resistance, scratch resistance, and adhesion relate to the durability of the coating.

33.    Chips and scratches, when present on exposed surfaced, are visible and, therefore, affect the appearance of the vehicle.

34.    Hiding relates both to appearance and to durability.

35.    If untreated, chips are a likely location for the formation of rust.

36.    If untreated, scratches are a likely location for the formation of rust.

37.    The clear coat included UV absorbing chemicals which prevent or limit the transmission of UV to the prime layer.

38.    Pigments in the color coat provide the desired color for the vehicle.

39.    The presence of clear coat over the color and prime prevented degradation of the prime

and color coats and extended their useful life.

40.      The presence of the prime, color coat, and clear coat over the metal provided for an aesthetically pleasing appearance of the body of the vehicle and prevented corrosion in the metal and extended its useful life.

41.      Color coat delamination is an undesirable condition in a painted vehicle.

42.      Color coat delamination results from a loss of adhesion between the color coat and the underlying prime.

43.      This loss of adhesion is the result of "chalking" at the prime surface.

44.      Chalking results form the exposure of the prime surface to ultraviolet radiation.

—————

It also appears undisputed that, except for painting and coating, the sheet metal components at issue exported from the United States for assembly into the imported trucks are entitled to duty exemption under HTSUS subheading 9202.00.80, as physically identifiable United States products ready for assembly, which are not otherwise advanced in value or improved in condition.  Trial Transcript ("Tr.") at 6.

As the court also found at the conclusion of the trial in Chrysler Corp., 19 CIT at 355, the court finds that the paint process as a whole is primarily for preservation.  See Uncontested Facts 7 (steps a. through d. are admittedly preservative), 8, 23-44.  Moreover, Dr. Norman R. Roobol, defendant's expert, a professor of industrial painting, testified that a fully painted vehicle would be expected to last up to fifteen (15) years without corrosion and a vehicle which was treated only through the prime layer would be expected to reveal corrosion within eighteen (18) to twenty-four (24) months.  Tr. at 176-79.  This is consistent with the testimony of Mr. Bjelica, see

Tr. at 53, and that of plaintiff's expert, Dr. Clifford K. Schoff, an expert in automotive coatings.

See Tr. at 112-13 (explaining that the primary purpose of the whole paint system is to preserve

the vehicle).

It is also clear that prevention of corrosion of metal parts is what preservative painting is

intended to do here. It does not matter whether the corrosion prevented would be unsightly or

not, minor or structural. If the process is intended to and does prevent corrosion it is

preservative, at least in part. Thus, the court rejects defendant's view that prevention of serious,

perhaps only perforation, corrosion is what is meant by preservative. Defendant's argument that

intermediate effects such as chipping, scratching, and delamination are irrelevant fails. Its view

that because all or some of these conditions may be corrected, they do not cause corrosion, is

untenable.[3] A manufacturer cannot assume that vehicle owners will perform detailed paint

inspections for the first signs of deterioration. Vehicle finishes are expected to last for years

without extraordinary intervention. See Tr. at 43.

On the other hand, the court rejects plaintiff's view that preservation of the paint layers

themselves or preservation of aesthetic appearance alone is sufficient. The assembled parts at

issue are metal parts. It is their preservation in an uncorroded state which is key. If the court

were to consider the paint system as one operation, plaintiff would prevail because the paint

system as a whole is intended to prevent corrosion of the metal parts, and thus 19 C.F.R. §

10.16(b)(3) would be satisfied. On this point, Dr. Schoff was clear and persuasive. The next

---

[3] It is clear that these processes affect appearance. The link between delamination and corrosion was somewhat muddled, but the testimony combined with uncontested facts reveal that chips, scratches, and delamination are all linked to corrosion. See Tr. at 62-66, 87-92 and Uncontested Facts 32, 35-36, 42-44.

issue, however, is whether for analytical purposes the court should subdivide the paint process and consider the last two coats, the base color coat and clear coat, separately. See Uncontested Fact 7 (steps e. and f.).

While there may be one paint process, it is composed of several operations. The regulation speaks in terms of "operations," which is consistent with the statutory language. Although it is not clear what constitutes a separate operation, a baking process separates the prime coat from the top coats, as the court noted in Chrysler Corp., 19 CIT at 354, and Daimler Chrysler, Slip Op. No. 00-124 at 11.[4] This sufficiently separates the top coats from the remainder of the paint process, so that, at least, together they are a separate operation. Accordingly, if any such separate painting step is primarily for purposes other than preservation, it will disqualify the article from treatment under the tariff exemption.

The color and clear coats obviously provide some preservative feature, primarily because of the ultraviolet ("UV") protection provided by these top layers, which ultimately prevents degradation of the primer. See Tr. at 89-90, 102, 167, 170 and Uncontested Facts 37, 39-44. The primer both preserves the underlying metal and provides a good surface for top coat adhesion. See Tr. at 97-101; Defendant's Exhibit ("Def.'s Ex.") L (McBane treatise) at 12-13; Uncontested Facts 8, 28, 40, 42. Moreover, the top coats must meet paint engineering standards, regardless of their appearance. See Tr. at 41-43; Plaintiff's Exhibits ("Pl.'s Ex.") 11-15 (regarding weathering, engineering, and material standards); Uncontested Fact 19. All paint must work. It must be

---

[4] In connection with Chrysler Corp., the court had the opportunity to view the entire assembly and painting process on site at DaimlerChrysler's Mexican plants. 19 CIT at 354 n.2. The parties are in agreement that the process the court observed and the one at issue here are essentially the same. Both parties originally asked the court to decide this case on the basis of the first trial.

appliable, it must stick, it must hide sublayers or surfaces, it must last, and it must meet other norms. Tr. at 45-46, Pl.'s Ex. 13-15 and Uncontested Fact 23. This does not determine whether it is primarily decorative or preservative.

These paints, however, are highly engineered to give distinctive appearances to the vehicles. The UV protection afforded by the top coats is also intended to protect the paint itself. See Tr. at 90, 166-69. It is also clear that the industry considers these coats primarily decorative and not primarily preservative. See Tr. at 76-77 (Testimony of T. Bjelica); Def.'s Ex. G (Connolly Depo.) and Ex. 3 thereto (memorandum to Chrysler dealers at 1); Pl.'s Ex. 12.

A tremendous amount of effort goes into color decisions and some colors are extremely expensive. See Tr. at 14-28 (Testimony of M. Hackstedde) and Tr. at 160 (Testimony of N. Roobol (stating that some colors can cost in excess of $100/gallon). The pigments are much more finely ground than those for primer paint. Tr. at 159-60.

What the market requires is a choice of colors, very high gloss ("wet look"), and reflection, otherwise known as distinctness of image ("DOI").[5] See Def.'s Ex. G at Ex. 3; Tr. at 17-20, 25-27, 52; Uncontested Facts 29-31. Gloss and DOI relate solely to appearance. Uncontested Fact 31. Gloss and DOI are provided by the clear coat. Tr. at 165-66. Although the clear coat does provide some protection to underlying layers, it is not necessary to a full

_____

[5] Dr. Roobol's testimony on this point, which plaintiff requests be stricken as beyond his expertise, is merely cumulative. Furthermore, the court found both experts well-qualified, even in collateral areas such as this, and finds them both credible. In fact, all of the witnesses were knowledgeable and remarkably candid. It is the inferences that one draws from the testimony that differ.

preservative system. See Tr. at 103, 164-167; Def.'s Ex. L at 32-33.[6]

Further, corrosion may be prevented by using different kinds of primers, different coatings on the steel, or different materials for the sheet metal components. See Tr. at 184-85. Finally, the court finds it significant that Dr. Schoff, plaintiff's precise and authoritative expert, never clearly stated that the top coats were primarily intended to be preservative, or even equally preservative and appearance enhancing.[7] The court perceived from the structure of the testimony and the demeanor of the witness that Dr. Schoff's testimony was tailored to avoid such conclusions and that no "expert" would opine that the top coats were essentially "preservative." Given the metals and primer chosen, these top coats must provide some preservation functions, but they are the way they are primarily for appearance reasons.

## CONCLUSIONS OF LAW

The general legal framework is fully set forth in the court's earlier opinion in this matter. See Daimler Chrysler Corp., Slip Op. No. 00-124. As the court has found as a matter of fact that the top coat operations are designed primarily to enhance the appearance of the vehicle and to impart to it distinctive features or characteristics, such as color, gloss, and DOI, the duty

---

[6] There was agreement among the experts that the type of primer used on the truck box was more susceptible to UV degradation and that the UV absorber in the clear coat was not as important for preservation of the more stable primer used on the other parts of the truck body. Tr. at 96-100, 170-71.

[7] Because 19 C.F.R. § 10.16(b)(3) does not say use the word "primarily" in describing preservative paint and § 10.16(c)(3) refers to "primarily" appearance enhancing painting, plaintiff argues that paint with two equal functions would qualify for the exemption. The court does not read the regulation that way. Preservative painting is not expressly qualified in § 10.16(b)(3), but the structure of the regulation suggests that a paint must be primarily preservative to satisfy the regulation. This potential ambiguity need not be resolved definitively as plaintiff did not prove equal functionality.

exemption at issue does not apply.  See HTSUS subheading 9802.00.80; 19 C.F.R. 10.16(c)(3).

Furthermore, the DaimlerChrysler employee witnesses and documents made it quite clear that the

top coats are not commonly viewed as "preservative" paints or coatings.  They are known as

decorative coats, distinguishing them from preservative coatings.

The court does not ignore plaintiff's argument that Congress intended an easily

administrable bright line test, and painting is painting is painting.  This is a superficially

appealing argument, and it is the one adopted by the dissent in General Motors Corp., 976 F.2d at

722-23, but the court concludes that there is no bright line and what is "painting" incidental to

assembly is not always easily determined.  For example, there seems to be agreement that a

replica of the Sistine Chapel ceiling on the hood of a vehicle, though "painting," is not what was

meant by Congress as an operation incidental to assembly, or what was meant by the regulation

drafters.  Less facetiously, plaintiff itself attached to its brief a representation of a vehicle with

flame decorations as an example of excluded painting.  Suppose the painting is not of flames but

the vehicle is painted in two tones or three tones?  Perhaps one could establish a standard that

any painting that takes an assembled article out of the norm for that article is disqualifying.  That

of course, is not a bright line test.  One would still debate the parameters of the norm.

After two trials and review of numerous exhibits, the court does not find this an easy

classification decision.  The top coat painting at issue is clearly a part of a broader painting

process and a part of the assembly process as well, and part of its function is to preserve the

underlying preservative layers and the metal substrate.  Moreover, there seems to be little

purpose to disqualifying the parts from duty exemption under the pre-NAFTA scheme applicable

to the vehicle.  It certainly would not have helped to encourage use of United States made parts,

which appears to be a purpose of the statute. Nonetheless, Congress may draft the exemption for U.S. parts assembled abroad as narrowly as it wishes and the court is bound to apply the law, which includes the regulation and the extant teachings of the Federal Circuit on this matter. As the top coats are primarily intended to enhance the appearance of the trucks, the duty exemption does not apply.

Because the preservative versus appearance-enhancing distinction is so difficult to draw in this case, the court alternatively determines that if the court could not apply either 19 C.F.R. § 10.16(b)(3) or (c)(3), and if it were called upon to decide if the top coat operations were other than "minor," see General Motors Corp., 976 F. 2d at 719, or whether they "impart[ed] significant new characteristics or qualities" to the vehicles for purposes of 19 C.F.R. § 10.16(c)(5), it would so conclude based upon the facts found. All of the evidence demonstrates that the top-coating processes are highly engineered, expensive, and primarily intended to make the vehicles eye-catching. Color, gloss, and DOI are distinctive. Plaintiff's view that "distinctiveness" must take the vehicles out of the norm for the product has no basis.

Judgment shall enter accordingly.

_____
Jane A. Restani
JUDGE

Dated:  New York, New York.

This 25th day of October, 2002.

# APPENDIX

**HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (19 U.S.C. § 1202)**

Subheading                                    Description

9802.00.80    Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting...........

**19 C.F.R. § 10.16  Assembly abroad.**

(a) *Assembly operations.*  The assembly operations performed abroad may consist of any method used to join or fit together solid components, such as welding, soldering, riveting, force fitting, gluing, laminating, sewing, or the use of fasteners, and may be preceded, accompanied, or followed by operations incidental to the assembly as illustrated in paragraph (b) of this section. The mixing or combining of liquids, gases, chemicals, food ingredients, and amorphous solids with each other or with solid components is not regarded as an assembly.

**(b) *Operations incidental to the assembly process.*  Operations incidental to the assembly process whether performed before, during, or after assembly, do not constitute further fabrication, and shall not preclude the application of the exemption.  The following are examples of operations which are incidental to the assembly process:**

(1)  Cleaning;

(2)  Removal of rust, grease, paint, or other preservative coating;

**(3)  Application of preservative paint or coating, including preservative metallic coating, lubricants, or protective encapsulation;**

(4)  Trimming, filing, or cutting off of small amounts of excess materials;

(5)   Adjustments in the shape or form of a component to the extent required by the assembly being performed abroad;

(6)  Cutting to length of wire, thread, tape, foil, and similar products exported in continuous length; separation by cutting of finished components, such as prestamped integrated circuit lead frames exported in multiple unit strips; and

(7) Final calibration, testing, marking, sorting, pressing, and folding of assembled articles.

**(c) *Operations not incidental to the assembly process.*  Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion,**

**physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article. The following are examples of operations not considered incidental to the assembly as provided under subheading 9802.00.80, Harmonized Tariff Schedule of the United States (19 U.S.C. 1202):**

(1) Melting of exported ingots and pouring of the metal into molds to produce cast metal parts;

(2) Cutting of garment parts according to pattern from exported material;

(**3**) **Painting primarily intended to enhance the appearance of an article or to impart distinctive features or characteristics;**

(4) Chemical treatment of components or assembled articles to impart new characteristics, such as shower-proofing, permapressing, sanforizing, dying or bleaching of textiles;

(**5**) **Machining, polishing, burnishing, peening, plating (other than plating incidental to the assembly), embossing, pressing, stamping, extruding, drawing, annealing, tempering, case hardening, and any other operation, treatment or process which imparts significant new characteristics or qualities to the article affected.**

(d) *Joining of American-made and foreign-made components.* An assembly operation may involve the use of American-made components and foreign-made components. The various requirements for establishing entitlement to the exemption apply only to the American-made components of the assembly.

(e) *Subassembly.* As assembly operation may involve the joining or fitting of American-made components into a part or subassembly of an article, followed by the installation of the part or subassembly into the complete article.

(f) *Packing.* The packing abroad of merchandise into containers does not in itself qualify either the containers or their contents for the exemption. However, assembled articles which otherwise qualify for the exemption and which are packaged abroad following their assembly will not be disqualified from the exemption by reason of their having been so packaged, whether for retail sale or for bulk shipment. The tariff status of the packing materials or containers will be determined in accordance with General Rule of Interpretation 5, HTSUS (19 U.S.C. 1202).

(Examples omitted and emphasis added.)