The UNITED STATES, Appellant,

v.

MAST INDUSTRIES, INC., Appellee.

Appeal No. 81–18.

United States Court of Customs and Patent Appeals.

Dec. 30, 1981.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Joseph I. Liebman, Attorney-in-Charge, and Saul Davis, New York City, for appellant.

Steven P. Florsheim and Robert B. Silverman, New York City, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is an appeal from the judgment of the United States Court of International Trade ("trial court")[1] sustaining the claim of appellee, Mast Industries, Inc. ("Mast"), that certain fabric components (of women's pants) manufactured in the United States and subjected to buttonholing and pocket slitting operations abroad were entitled to a duty allowance for the cost or value of the components under item 807.00 of the Tariff Schedules of the United States ("TSUS").[2] We affirm.

## BACKGROUND

### The Merchandise

Involved are four entries of two styles of women's pants, style 4083 and style 4086. The fabric components of the pants were cut to shape in the United States for Mast, then shipped to a factory in El Salvador together with all other necessary components, such as thread and buttons, where they were finished into completed garments. In addition to being sewn together, certain of the components were subjected to buttonholing and pocket slitting. As to those components, the Customs Service disallowed item 807.00, TSUS, treatment, and that determination was contested by Mast.

At trial, Mast's production manager, Salvatore Fasciana, explained how the buttonholes and slash pockets were made. When a pedal was depressed, a Reece S–2 buttonholer clamped a fabric component to the machine bed, sewed around the buttonhole

---

1. *Mast Industries, Inc. v. United States*, 1 CIT ——, 515 F.Supp. 43 (1981).

2. The relevant statutory provisions are as follows:

TSUS, Schedule 8, Part I, Subpart B—Articles Advanced or Improved Abroad
  Subpart B headnotes:

. . . .

3. Articles assembled abroad with components produced in the United States.—The following provisions apply only to item 807.00:

. . . .

(b) The duty on the imported article shall be at the rate which would apply to the imported article itself, as an entirety without constructive separation of its components, in its condition as imported if it were not within the purview of this subpart. If the imported article is subject to a specific or compound rate of duty, the total duties shall be reduced in such proportion as the cost or value of such products of the United States bears to the full value of the imported article.

. . . .

| ITEM | | |
|---|---|---|
| 807.00 | Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting. | A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart.) |

area, and automatically cut the buttonhole slit. The machine cycle time for each buttonhole was approximately 2.5 hundredths of a minute (1.5 seconds). During assembly of the pockets, a Singer 112W140 sewing machine simultaneously cut a slit in the rear quarter panel component and sewed the welt piece and facing piece to either side of the slit. Small diagonal cuts were then made at each end of the welt; the welt, the facing, and the two parts of the pocket bag (which were previously sewn to the welt and facing) were turned through the slit to the wrong side of the rear quarter panel. The welt seam was then top stitched, the pocket components were turned back through the slit to the right side of the fabric, the pocket bag was stitched together, and the pocket was again turned through the slit.

Mr. Enrique Siman, owner and manager of the El Savadoran factories where the pants were assembled, explained the production of the two styles of pants. Style 4083 was assembled in 35 operations by 70 employees. Style 4086 was assembled in 40 operations by 70 employees. For each style, buttonholing and pocket slitting each constituted one operation and required one employee. Approximately 35 minutes were required to assemble style 4083. Buttonholing required 8–10 seconds, and the rear pocket slit required 15–20 seconds. Assembly of style 4086 required 36 minutes with 7–8 seconds for buttonholing and about 30 seconds for the pocket slitting. The direct labor cost was 1.36 colones for style 4083 and 1.40 colones for style 4086. For each style 0.0075 colones was for making each button hole and 0.025 colones was for pocket slitting.[3]

Witnesses also testified that the buttonholes should be made before the buttons are set (sewn on) to insure that the buttons line up, and that buttonholes and pocket slits improved the commercial value of the pants, enabling them to conform to the specifications.

3. Mr. Siman also stated that at the time the pants in issue were assembled, $1.00 equaled

*Decision of Court of International Trade*

The trial court held that buttonholing and pocket slitting on the precut fabric components constituted "no more than the performance of operations incidental to the assembly of the various cut pieces into the two styles of women's pants here involved." The court stated that it was—

unable to distinguish the instant case in principle from [*Miles v. United States*, 65 CCPA 32, C.A.D. 1202, 567 F.2d 979 (1978).] There is no question in the court's mind but that slitting the fabric for buttonholing and pocket insertion purposes were relatively minor procedures, as was the preliminary remedial sewing in the buttonhole area. And the fact that these operations were accomplished by machines is of no moment in the overall assessment of their significance. In [*Miles*] v. *United States, supra,* the object of burning holes and slots in beams with an acetylene torch was similar to the object of making buttonholes and pocket slits in ladies pants with machines. Moreover, on the circumstances detailed in this record it would appear that a judicious regard for proper alignment of the affected areas in the garments dictated the deferral of these minor operations until *assembly* of the garments rather than at some prior time. Said operations were not such substantial changes as to constitute further fabrication. No new portion of the pants was made, and the cost of performing these operations, in terms of both labor and expense was a small portion of the total cost of assembly.

1 CIT at ——; 515 F.Supp. at 46–47.

OPINION

The issue before us is whether the Court of International Trade correctly decided that: (1) the precut fabric components shipped by Mast to El Salvador and there subjected to buttonholing or pocket slitting, "were exported in condition ready for as-

2.5 colones.

sembly without further fabrication," item 807.00(a), TSUS; and (2) those components were not "advanced in value or improved in condition abroad except by . . . operations incidental to the assembly process such as cleaning, lubricating, and painting," item 807.00(c), TSUS.

## I. Question of Further Fabrication

■ The government relies on *Zwicker Knitting Mills v. United States*, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980), to support its position that buttonholing and pocket slitting constituted further fabrication necessary before the components could be assembled. In that case, the trial court (82 Cust.Ct. 34, 37, C.D. 4786, 469 F.Supp. 727, 729 (1979)) found that glove shells were knitted in the United States on machines which could not close the fingertips. The open-fingered glove shells, precut palms, and, in one entry, a separate piece of yarn were sent to Haiti, where a piece of yarn was passed through the top row of loops at each fingertip to lock the loops and thereby fix the knitting so that it would not unravel. The shells were paired and shaped, and the precut palms were sewn on the shells. This court held that the glove shells were not entitled to an item 807.00 duty allowance because the Haitian "tipping" operation constituted "further fabrication," item 807.00(a).

The trial court distinguished *Zwicker*, stating:

> *Zwicker* involved a fingertipping operation performed abroad on glove shells exported from the United States minus the fingertips. And, unlike the situation at bar which involved only a *separation* or *removal* for an opening in fabricated material, the *Zwicker* operation involved an *addition* of material to close the fingertips. It was this *addition* of material which influenced the courts in *Zwicker* to find that the tipping operation constituted a "further fabrication" of the gloves which is proscribed by item 807.00(a).

1 CIT at ——, 515 F.Supp. at 47. We are persuaded that *Zwicker* is distinguishable not merely because it involved an addition of material, while the present case involves a separation, but, more importantly, because in *Zwicker* the glove shells were only partially *fabricated* in the United States by knitting. Locking the loops at the tip of each finger to prevent unraveling was a part of the knitting process of the glove shell not completed in the United States, and one that was required to complete the component prior to shaping and attaching the precut palms. Therefore, the tipping operation was a continuation of the knitting process and constituted further fabrication of the component. In the present case, the components were cut to shape in the United States, and, at that point, were fabricated components ready to immediately enter into the assembly process. *See General Instrument Corp. v. United States*, 61 CCPA 86, 89, C.A.D. 1128, 499 F.2d 1318, 1321 (1974).

Nevertheless, on the basis of evidence that the buttonholes had to be made before the buttons were sewn on the pants and that the pockets could not be assembled without the pocket slit, the government argues that the operations in question constituted further fabrication which was necessary and prior to completing the assembly of the garments. However, although such operations were necessary to complete the assembly process, they did not complete the manufacturing process by which the cut-to-shape fabric components were fabricated. *Cf. Zwicker, supra.* Moreover, the government's position is at odds with the decision in *Miles v. United States, supra.* In *Miles*, this court held that burning slots and holes into 55 foot steel Z-beams, which were assembled as center sills of boxcars, was incidental to the assembly process. The holes were necessary to install wear plates and support plates, to allow passage of brake pipe, and to allow insertion of the draft keys which fix the couplers to the yokes. Although the making of the slots and holes was a prerequisite to assembly, that did not disqualify the Z-beams under item 807.-00(a).[4]

4. The government argues that *Miles* is distinguishable because the buttonholes and pocket

slits here involved create features which sur-

Accordingly, we hold that the buttonholing and pocket slitting operations were not further fabrication within the meaning of item 807.00(a).

## II. *The Incidental-to-Assembly Question*

■ Since we agree with the government that buttonholing and pocket slitting advanced the value and improved the condition of the assembled components, it is necessary to determine whether these operations were "incidental to the assembly process."

In seeking to distinguish *Miles v. United States, supra*, the government argues that item 807.00(c), "was intended to encompass those operations which solely related to the assembly process and which were of a minor nature." It contends that the slots and holes in *Miles* "possessed a function and utility that *only* related to assembly"; whereas, the buttonholes and pocket slits involved here have "essential functions and utility that possess *absolutely no relationship to the assembly process*," *viz.*, to allow closure of certain portions of the pants and entry and exit to the pocket. Because these operations created features in the garments which had a utility independent from the assembly process, it is argued that they could not be "merely incidental" to assembly.

The trial court rejected the applicability of this "independent utility" theory to either item 807.00(a) or (c), saying—

Defendant argues that because buttonholes and slash pockets possess utility to the seller and consumer of the pants independent of the assembly operations the processing of the garment to achieve these utilitarian goals constitutes an *indicia* of "further fabrication". The court does not see how the ultimate use of the garment has any bearing on the application of the statutory criteria. Buttonholes and slash pockets were an integral part of the design concept of the imported pants from the outset. And the at-

tainment of that object was merely an incident of the *assemblàge* of the various component parts—the only significant work remaining to be done when the components were exported to El Salvador.

1 CIT at ——, 515 F.Supp. at 47. We are persuaded that the government urges too narrow a construction of the statute. Indeed, the statute sets forth "painting" of a component as an example of permissible operations incidental to assembly. Painting could serve both to enhance the appearance of an article and to protect it from corrosion—each an independent utility. It is difficult to visualize a situation where the sole purpose of painting would be to facilitate assembly, or even where painting would be essential to the assembly process.

We note that the government's "independent utility" theory is also unsupported by case law. In *Miles*, whether the slots and holes in the Z-beams had utility outside the assembly process was not considered, although slots in the end of each beam allowed the insertion (and presumably the removal) of draft keys for fixing the couplers to the yokes. This utility survived the assembly process. There appears to be no reasonable distinction under the statute between holes which allow insertion of draft keys and holes which allow insertion of buttons.

Legislative history sheds additional light on the meaning of "incidental to the assembly process."

The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other preservative

vive the assembly process. The fallacy of this argument is demonstrated in our discussion of

item 807.00(c), *infra*.

coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or to *paint or apply other preservative coatings. It may also be necessary to test and adjust the components.* Such operations, *if of a minor nature* incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad. [Emphasis supplied.]

H.R.Rep.No.342, 89th Cong., 1st Sess. 49 (1965). Thus, such operations as applying preservative coatings and testing and adjusting the components are incidental to the assembly process "if of a minor nature."

The apparent legislative intent was to not preclude operations that provide an "independent utility" or that are not essential to the assembly process; rather, Congress intended a balancing of all relevant factors to ascertain whether an operation of a "minor nature" is incidental to the assembly process. Relevant factors in this case include:

(1) Whether the cost of the operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered "minor." *See Miles, supra* at 36, 567 F.2d at 982. (Here, the time required for each operation compared to the overall time required for assembly of the articles was minor. The same is true of the cost of each operation relative to the cost of each affected component. For example, the least expensive component in which a buttonhole was placed in style 4083 was the side pocket flap lining, with a United States cost of $0.020. By contrast, the

buttonholing cost was 0.0075 colones, or $0.003.) [5]

(2) Whether the operations in question were necessary to the assembly process, as were the slots and holes in *Miles.* (The government acknowledges that placing buttonholes and making the pocket slit were prerequisites to other assembly steps.)

(3) Whether the operations were so related to assembly that they were logically performed during assembly. (Buttonholing and pocket slitting were closely related to the assembly process. Both involved taking needle and thread to fabric, as in the assembly process. Both were done with special sewing machines. The relationship of these operations to assembly is further demonstrated by the availability of alternative closures and pockets which may obviously be incorporated into pants through operations which are solely assembly operations.) [6]

■ Applying these factors [7] to the facts before us, we hold that the buttonholing and pocket slitting operations were "incidental to the assembly process."

The judgment of the trial court is *affirmed.*

---

**5.** Because the buttonhole goes through both the pocket flap and the pocket flap lining, it would be more appropriate to compare the buttonholing cost to the cost of the pocket flap subassembly comprising both pieces, $0.076.

**6.** Dorothy Moulla, a designer for Mast, testified that hooks and eyes, snaps, zippers, and ties were acceptable alternatives to the buttons used in the subject garments and that the use of patch pockets would obviate the need for slitting the rear quarter panel during assembly.

She also indicated that involved style 4083 garments had a patch pocket on the front leg. The Customs Service *approved* an item 807.00 allowance for the component to which the patch pocket was attached.

**7.** Another factor not addressed by the parties would be whether economic or other practical considerations dictate that the operations be performed concurrently with assembly.