**LEVI STRAUSS & COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Slip Op. 97–79.
Court No. 93–11–00726.

United States Court of International Trade.

June 19, 1997.

Sandler, Travis & Rosenberg, P.A. (Edward M. Joffe, Jorge Espinosa and Arthur K. Purcell), Miami, FL, for plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, DC; Joseph I. Liebman, Attorney in Charge, New York City, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Saul Davis); of counsel: Laura R. Siegel, Office of the Assistant Chief Counsel, United States Customs Service, for defendant.

## OPINION

MUSGRAVE, Judge.

Plaintiff Levi Strauss & Company ("Levi") brings this action to contest the denial of a protest by the United States Customs Service ("Customs") that sought duty allowances for U.S. origin cotton denim fabric components that were shipped to Guatemala for assembly and reentered into the U.S. Levi requested that the subject merchandise be allowed partial duty allowances under subheading 9802.00.80 of the HTSUS arguing that the cotton denim components were not advanced in value or improved in condition other than by the actual assembly or by minor operations incidental to assembly. Customs denied the protest on the basis that the "enzyme-washing" process, commonly referred to as stonewashing, placed the subject merchandise out of the purview of subheading 9802.00.80 because the finishing operations were not minor or incidental to assembly. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) and finds that enzyme-washing in this case was incidental to assembly and orders Customs to refund the amount of duty in question with interest.

### *Background*

The subject merchandise is 100% cotton denim fabric components manufactured in the U.S. and then exported to Guatemala for assembly into boy's cotton denim jeans known as style "550" five-pocket denim jeans. The denim fabric is cut-to-shape by Precision Cutting, Inc. in Spartanburg, S.C. and along with other components of the finished product including buttons, thread, zippers and other trim items, is transported to a Guatemalan assembler/laundry known as Koramsa,

S.A. Koramsa assembled the denim jeans from the material supplied entirely by Levi. Immediately after assembly, the denim jeans were enzyme-washed, dried, pressed, labeled, inspected, sorted and packed for shipment to the U.S.

Upon importation into the U.S. in 1993, the subject merchandise was classified by Customs as boy's 100 percent cotton woven trousers under HTSUS subheading 6203.42.40 with a duty rate of 17.7% *ad valorem.* Levi timely filed a protest claiming that the cost or value of the U.S. cut-to-shape denim fabric components should have been deducted from the duty assessment under subheading 9802.00.80 of the HTSUS. Customs denied the protest on the grounds that the enzyme-washing process employed by Levi was not a minor operation incidental to the assembly process as contemplated by subheading 9802.00.80. Levi timely filed a summons and complaint with the Court contesting Customs' protest denial.

### Standard of Review

■ Under 28 U.S.C. § 2639(a)(1), Customs' decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision."[1] However, recent decisions from the Court of Appeals for Federal Circuit ("CAFC") have ruled that the presumption of correctness applies solely to factual questions and this Court's duty is to find the correct result.[2] The Court reviews the ultimate question in a classification case *de novo.* As the Court has found, classification decisions entail a three step process.

The purely factual inquiry in every classification case involves determining what the subject merchandise is and what it does. The purely legal question involves determining the meaning and scope of the tariff provisions. The ultimate mixed question becomes whether the merchandise has been classified under an appropriate tariff provision, or equivalently, whether the merchandise fits within the tariff provision. This ultimate issue involves both a legal and factual component: indeed the ultimate issue is an inseparable hybrid of the discrete factual and legal inquiries and is therefore a mixed question of law and fact reviewable *de novo.*

*Bausch & Lomb, Inc. v. United States,* 21 CIT ——, ——, 957 F.Supp. 281, 284 (1997). The purely factual inquiry is subject to the "clearly erroneous" standard while the purely legal question and the ultimate mixed question of law and fact are reviewable *de novo. Id.* at 284.

Although this case comes before the Court for a review of Customs classification pursuant to 28 U.S.C. § 1581(a), the issue involved does not confront nor generate the typical classification considerations. Unlike most classification reviews, there is no contention between the parties as to competing tariff provisions: under subheading 9802.00.80 the subject merchandise either satisfies the statute or it does not. Therefore, the purely legal question found in most classification cases has already been answered. Further, the parties in the instant case have no argument as to the material facts at issue thereby precluding the need to answer the purely factual questions involved in a classification case. What remains is the ultimate mixed

---

1. 28 U.S.C. § 2639(a)(1) (1994).

2. The duty of the Court to find the correct result in a classification case stems from both legislative and judicial sources. "[T]he trial court … must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative.… [T]he court's duty is to find the correct result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). "If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision." 28 U.S.C. § 2643(b). *See Goodman Mfg., L.P. v. United States,* 13 Fed.Cir. (T) ——, ——, 69 F.3d 505, 508 (1995) (the statutory presumption of correctness attaches only to an agency's factual determinations) *and Rollerblade, Inc. v. United States,* 112 F.3d 481, 484 (1997) (legal issues are not afforded deference under 28 U.S.C. § 2639 or under the administrative deference standard promulgated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

question of law and fact, or whether the facts satisfy or fit the statutory standard which the Court reviews *de novo* to determine the correct result.

***Discussion***

■ Levi contests Customs' denial of a protest seeking duty allowances under HTSUS subheading 9802.00.80 for the U.S. origin cut-to-shape denim fabric components shipped to Guatemala and reentered into the U.S. Customs denied the duty allowance based on the conclusion that the enzyme-wash performed in Guatemala advanced the value or improved the condition of the U.S. origin components in a significant manner thereby placing the subject merchandise outside the scope of subheading 9802.00.80. The statute together with its legislative history and relevant case law lead the Court to find that the added value or improvement in condition provided by the enzyme-wash was minor and incidental to the assembly process qualifying the subject merchandise for duty allowance under subheading 9802.00.80.

Subheading 9802.00.80 provides that:

Articles, except goods of heading 9802.00.90, assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting.

[With a general rate of duty of:]

A duty upon the full value of the imported article, less the cost or value of such products of the United States. . . .

HTSUS subheading 9802.00.80 (1996). In order for goods to be allowed 9802.00.80 status, all three subparts must be satisfied. In the instant case, the parties are not contesting subparts (a) and (b) of subheading 9802.00.80. The parties and the Court agree that the first section of subpart (c) is not at issue since the enzyme-wash does advance the value of the denim fabric components as well as improve their condition. This leaves a single question of whether the enzyme-wash falls into the exception of subpart (c): is the enzyme-wash an operation incidental to the assembly process?

The legislative history of HTSUS subheading 9802.00.80 is illuminating. The predecessor of subheading 9802.00.80, item 807.00 of the TSUS was amended in 1965 and the House Report states:

The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. . . . Such operations, if of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

H.R.Rep. No. 88–1728, at 46 (1964). The predecessor to the CAFC, the U.S. Court of Customs and Patent Appeals, interpreted the language of the legislative history and forged a set of criteria to determine whether a process is incidental to assembly in *United States v. Mast Industries, Inc.,* 69 C.C.P.A. 47, 668 F.2d 501 (1981). The *Mast* court found that the "legislative intent was to not preclude operations that provide an 'independent utility' or that are not essential to the assembly process; rather, Congress intended a balancing of all relevant factors to ascertain whether an operation of a 'minor nature' is incidental to the assembly process." *Id.* at 53–54, 668 F.2d at 506. The *Mast* court then listed the relevant factors useful in ascertaining whether a process is incidental to assembly:

(1) Whether the cost of the operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered "minor."

(2) Whether the operations in question were necessary to the assembly process....

(3) Whether the operations were so related to assembly that they were logically performed during assembly.

[ (4) W]hether economic or other practical considerations dictate that the operations be performed concurrently with assembly.[3] *Id.* (citations omitted). The application of these so-called *"Mast* factors" facilitates the Court's resolution of whether the enzyme-wash employed by Levi is incidental to the assembly of the imported denim jeans.

### I. Cost and Time Comparisons

The first *Mast* factor is composed of a cost element and a time element. In weighing these elements, courts have first been obliged to define the scope of the contested operation as well as the scope of the comparative assembly process. In a recent CAFC decision reviewing duty allowance for an intricate painting procedure, the court defined the scope of the contested operation to be comprised of the total of all of the painting steps in order that item 807.00 was not undermined "by allowing major and significant operations to be broken down to a point where each step could be called minor." *General Motors Corp. v. United States,* 16 Fed.Cir. (T) ——, ——, 976 F.2d 716, 720 (1992). Since the scope of the enzyme-wash procedure at issue here is well-defined, the danger lies in defining the scope of the comparative assembly process; limiting the scope of the comparative assembly process directly increases the importance of the operation which would allow potentially minor steps to be built up to major and significant operations.

The Court notes the subtle difference in the wording between the cost comparison and time comparison in *Mast.* The *Mast* court perspicaciously compared the "cost of the operation relative to the cost of the *affected component* " which properly measures

the relative importance of the process at issue with the subject merchandise considered for the duty allowance.[4] The correct cost comparison is accordingly made between the cost of the enzyme-wash process and the cost of the denim fabric components, which is the subject of the duty allowance at issue here. Model cost comparisons measure the percentage of relative specific costs by simply dividing the cost of the process by the component cost which yields a percentage representing that specific costs' relative importance. Applying that methodology, the relative cost is computed by dividing the enzyme-wash cost of $.80 by the denim fabric cost of $2.96 resulting in a figure of 27%.

In *General Motors,* the CAFC also compared capital investment costs in its overall cost determination. *General Motors Corp. v. United States,* 16 Fed.Cir. (T) ——, ——, 976 F.2d 716, 721. Levi uses the same capital equipment for all of its washing operations. The Court finds that the capital investment cost, therefore, is minor. Taken together, the cost of the enzyme-wash relative to the denim fabric components and the capital investment cost are minor and incidental to the assembly process. The Court finds that the cost comparison weighs in favor of granting the duty allowance for the denim fabric components at issue.

 Time comparisons provide concurring results. In contrast to the cost comparison, the time comparison promulgated from the *Mast* court gauged "the time required by the operation relative to the time required for assembly of the *whole article.* " *United States v. Mast Industries, Inc.,* 69 C.C.P.A. 47, 54, 668 F.2d 501, 506 (1981) (emphasis added). Levi washes 296 pairs of denim jeans in a single wash which takes 99 minutes. Customs argues that the total enzyme-wash time of 99 minutes must be used for each garment assembled. The Court disagrees with that analysis since this would allow potentially minor steps to be built up to major and significant operations. The correct wash time per garment is determined by

---

**3.** The fourth factor was not at issue in *Mast* but the court noted its potential relevance in other actions.

**4.** *United States v. Mast Industries, Inc.,* 69 C.C.P.A. 47, 54, 668 F.2d 501, 506 (1981) (emphasis added).

dividing the time of the wash by the number of garments washed. The result is that the enzyme-wash takes .334 minutes per garment. The per garment total assembly time is nineteen minutes. The relative time is calculated by dividing the per garment wash time by the per garment total assembly time which results in a 1.1% relative time. The Court finds that 1.1% represents a minor time interval and, together with the cost comparisons, is incidental to the assembly process.

## II. Necessary to the Assembly Process

Although enzyme-washing is closely related to the assembly process, the process cannot be said to be necessary to the assembly process. In manufacturing other apparel, Levi sends fully assembled garments to separate enzyme-washing facilities. In fact prior to installation of the enzyme-wash machinery in Guatemala, Levi shipped the assembled denim jeans to U.S. finishing facilities where the enzyme-wash was conducted. The Court finds that the enzyme-wash procedure is not necessary to the assembly process and this factor weighs against granting the duty allowance under subheading 9802.00.80.

## III. Logically Performed During Assembly

The third *Mast* factor assesses the need for the performance of the enzyme-washing operation during the assembly process. Customs argues that the enzyme-wash is "not at all directly related to the sewing operations which constitute assembly here." Def.'s Post Trial Br. at 29. This claim, however, ignores the true focus of this factor which is whether the operation in question is logically performed during the assembly process. The entire inquiry may be aptly described as determining whether there is a direct relationship between the enzyme-wash and the whole assembly process performed overseas, but the Court finds that the aim of the third *Mast* factor is to ascertain whether the enzyme-wash is logically performed during the assembly process. Levi has asserted that the enzyme-wash is "more sensibly performed under the same roof at the assembly plant" which is "due to the nature of the

process and the requirement that it be completed prior to the other finishing operations." Pl.'s Post Trial Br. at 9. The Court finds the enzyme-wash operation is logically performed at the situs of the assembly process where all other assembly and post-assembly steps are performed and where the trained personnel are located. Transferring the enzyme-wash process would entail the utilization of a separate set of production factors which the Court finds would favor the performance of the enzyme-wash at the plant in Guatemala. This *Mast* factor weighs in favor of providing duty allowance to the denim fabric under subheading 9802.00.80.

## IV. Economic and Practical Considerations

■ Customs contends that this criterion has no bearing on the resolution of the issue before the Court. Customs states,

both item 807.00(a) and (c) contemplate that there will be prohibitory non-assembly operations performed concurrently with assembly. Therefore, if this factor were utilized, as indicated by *Mast,* it would essentially eviscerate the clearly stated prohibited operations contemplated by item 807.00(a), and the prohibited advancements in value or improvements in condition performed before, during, or after assembly, which are implicit in item 807.00(c).

Def.'s Post Trial Br. at 29–30. Customs' interpretation of the fourth *Mast* factor is mistaken. The fourth *Mast* factor does not violate either subpart (a) or (c) of item 807.00; in fact, as stated in this opinion and agreed to by the parties, the sole question at issue is outside of the purview of subpart (a) and the first element of subpart (c), which Customs calls into question here.

Levi states that there are numerous economic and practical reasons for conducting the enzyme-wash at the situs of the assembly plant in Guatemala. Levi argues that its ability to detect and correct sewing and laundry defects would be compromised since these defects are more easily discovered after washing the garment. Pl.'s Post Trial Br. at 9. Levi also contends that performing the enzyme-wash on site in Guatemala pro-

duces more first quality garments and reduces the time it takes to get the garments to the buyer. *Id.* at 9–10. Additional labor costs would also be incurred if the enzyme-wash process were performed in the U.S. as the garments would have to be unpacked and repackaged. *Id.* at 10. The Court finds that there are economic and practical advantages of performing the enzyme-washing operation at the site of final assembly. This factor weighs in favor of granting duty allowance under subheading 9802.00.80.

## V. Protection of the U.S. Industry

Customs makes a broad policy argument concerning what Customs proclaims as Levi's embarkation on a course of moving operations overseas that will negatively impact on the U.S. domestic industry. Def.'s Post Trial Br. at 2. Customs states,

> It is a basic principle of Customs jurisprudence that tariff laws were intended to raise revenues and were enacted to "encourag[e] the industries of the United States.["][sic] While Levi may generally be considered a domestic company, when we are discussing the transfer of United States operations abroad the real domestic industry that is protected and must be "encouraged" by the limitations Congress placed upon the grant of duty free treatment in heading 9802 is the United States finishing industry that may be seriously injured by the transfer of finishing operations abroad, and the domestic industry that manufactures machinery and equipment in the United States that is clearly going to be injured by the transfer of finishing operations to Guatemala, which purchases archaic equipment from Korea due to Guatemala's low labor costs.

Def.'s Post Trial Br. at n. 1 (citation omitted). The Court notes that this argument is misplaced. The parties have not submitted and the Court is not aware of any evidence to substantiate the claim that the legislative intent behind subheading 9802.00.80 and its predecessor item 807.00 was to protect the domestic industry from U.S. companies' moving operations offshore. The only discus-

sions of the intent behind the enaction of item 807.00 was to allow U.S. produced goods to compete with foreign made goods, which is exactly what Levi has done here.[5]

The argument that Customs forwards cuts both ways. By denying the duty allowance, there is a further benefit to the U.S. company to relocate their entire operation offshore. Recognizing this danger Chief Judge Nies warned that "[b]ecause of the denial of the deduction for these United States components, another part of the fabrication of automobiles in the United States will likely be lost. This cannot be the intent of Congress." *General Motors Corp. v. United States,* 16 Fed.Cir. (T) ——, ——, 976 F.2d 716, 723 (1992). What is to prevent Levi from moving the fabric manufacturing and cutting operations offshore when the denial of duty allowance increases domestic costs beyond the costs incurred overseas? The Court is reluctant to wade into these turbulent policy waters particularly when neither the statute nor its legislative history compel the Court.

## VI. Other Considerations

Finally, the Court finds that the enzyme-wash is analogous to cleaning and painting which the statute specifically lists as being minor and incidental to the assembly processes. The enzyme-wash does not add anything to the denim fabric, it simply removes a measure of the indigo dye and gives the denim fabric a certain amount of abrasion that would naturally come from washing and wearing the denim jeans. Further, the enzyme-wash does not change the composition or structure of the denim fabric. Similarly, in *Haggar Apparel Co. v. United States,* 20 CIT ——, 938 F.Supp. 868 (1996), the Court found that the curing operation which imparted crease retention and seam and surface flatness to men's pants was minor and incidental to the assembly process. The enzyme-wash is directly comparable to the curing operation in *Haggar* and the Court finds that the same reasoning and conclusion are applicable to the instant case.

Taken as a whole, the *Mast* factors as applied to the instant case and all other

---

5. *See Free List, Special and Administrative Provisions: Hearings on the Tariff Act of 1929 Before* *the Committee on Finance,* 71st Cong. Vol. 6, 125–134 (1929).

considerations weigh in favor of granting the duty allowances. Both cost and time comparisons are evidence that the enzyme-wash is incidental to the assembly process involved in producing the denim jeans in question. The enzyme-wash procedure is not necessary to the assembly process but it is logically, economically and practically performed in conjunction with the assembly process. Therefore, the balancing of all of the relevant factors before the Court weighs in favor of granting the duty allowance under subheading 9802.00.80 for the U.S. produced denim fabric.

### Conclusion

For the foregoing reasons, the Court finds that the denim fabric is correctly classified under HTSUS subheading 9802.00.80.

### JUDGMENT

Upon conducting trial, reading plaintiff's pretrial and post trial briefs, defendant's pretrial and post trial briefs, and upon consideration of all other papers and proceedings had herein, it is hereby

**ORDERED** that the defendant reliquidate the subject entries with a duty allowance for the value of the U.S. origin fabric components under HTSUS subheading 9802.00.80; and it is further

**ORDERED** that defendant refund the duties paid on the U.S. origin fabric together with the attributable costs such as cutting and inland transportation with interest.