**LEVI STRAUSS & COMPANY,**
Plaintiff–Appellee,

v.

**UNITED STATES, Defendant–Appellant.**

No. 97–1536.

United States Court of Appeals,
Federal Circuit.

Sept. 22, 1998.

Rehearing Denied Nov. 24, 1998.

Ronald W. Gerdes, Sandler, Travis & Rosenberg, P.A., Washington, DC, argued for plaintiff-appellee.

**1346**

Saul Davis, Senior Trail Counsel, Civil Division, Commercial Litigation Branch, International Trade Field Office, U.S. Department of Justice, New York, New York, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, U.S. Department of Justice, Washington, DC; and Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Of counsel on the brief was Karen P. Binder, Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, New York, New York.

Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

The United States appeals from the judgment of the United States Court of International Trade reversing the denial by the United States Customs Service ("Customs") of Levi Strauss & Company's ("Levi's") protest that Levi was improperly denied a deduction from its duty assessment for the cost of certain fabric components manufactured in the United States. *See Levi Strauss & Co. v. United States,* 969 F.Supp. 75 (Ct. Int'l Trade 1997). This case was submitted for our decision following oral argument on August 5, 1998. Because, in accordance with our case law, the Court of International Trade properly reviewed Customs's interpretation of the pertinent classification regulations without deference and because the Court of International Trade's determination that the non-assembly operations performed outside of the United States were incidental to the assembly process was not clearly erroneous, we affirm.

## BACKGROUND

The merchandise at issue in this appeal consists of boys' "stonewashed" jeans sold by Levi in the United States under the Levi trademark. The jeans are assembled in Guatemala from denim fabric components and other incidental components, all of which are manufactured in the United States.

Denim fabric is composed of two types of cotton yarn woven in a crisscross pattern. One type, the weft yarn, is undyed, while the other type, the warp yarn, is dyed in indigo. However, because indigo has only a weak affinity for cotton, the indigo dye is merely painted on the warp yarn and is readily removed through washing as well as normal wear and tear. Thus, as a result of one half of the yarn being undyed and the other half having readily removable dye, the jeans fade in color fairly rapidly. As the parties here agree, this faded appearance is considered desirable to consumers. Accordingly, manufacturers, including Levi, remove the oils and waxes used in the weaving process that otherwise slow down the fading. In addition, manufacturers lighten the color by washing the jeans. These processes also soften the jeans, which it is agreed is also desirable to consumers. Some manufacturers also accelerate the washing process by stonewashing. This is where stones, or other such particles, are added to the wash to produce abrasion and thereby accelerate the wear and tear. Certain manufacturers, including Levi in the instant case, achieve the same stonewashing effect by adding an enzyme having the brand name "Cellulase" or "Denimax" to the wash.

The denim fabric for the merchandise at issue is cut to shape in Spartanburg, South Carolina, and then shipped, along with other components, such as buttons, threads, and zippers, to Koramsa, S.A., a company located in Guatemala. Prior to May 1993, Koramsa assembled the jeans and then returned them to the United States where Levi then applied the stonewashing process. After May 1993, Koramsa also provided stonewashing in Guatemala.

Upon importation into the United States, the subject merchandise was classified by Customs as boys' one hundred percent cotton woven trousers under subheading 6203.42.40 of the Harmonized Tariff Schedule of the United States ("HTSUS"). This classification carried a duty of 17.7%. Levi filed a timely protest asserting that the cost or value of the denim fabric components manufactured in the United States should have been deducted from the duty assessment pursuant to HTSUS subheading 9802.00.80. Subhead-

ing 9802.00.80 provides a partial duty exemption for:

[a]rticles, except goods of heading 9802.00.90, assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) *have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting.*

(emphasis added). Customs denied Levi's protest on the grounds that the stonewashing process undertaken in Guatemala was not an operation "incidental to the assembly process" as contemplated by subheading 9802.00.80.

Levi appealed the decision to the Court of International Trade, which held that Customs incorrectly denied Levi a partial duty exemption for its denim fabric components. The Court of International Trade initially noted that subheading 9802.00.80 originated from item 870.00 of the former Tariff Schedule of the United States. Item 870.00 was amended in 1965 to the currently applicable language and the accompanying House Report stated:

The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. . . . Such operations, if only of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

H.R.Rep. No. 88–1728, at 46 (1964). The Court of International Trade explained that in *United States v. Mast Industries, Inc.*, 69 C.C.P.A. 47, 668 F.2d 501 (C.C.P.A. 1981), the United States Court of Customs and Patent Appeals, this court's predecessor court, interpreted this provision and its legislative history to provide a set of factors to be used in ascertaining whether a process is incidental to assembly. These so-called *Mast* factors are:

(1) Whether the cost of the operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered "minor." . . .

(2) Whether the operations in question were necessary to the assembly process. . . .

(3) Whether the operations were so related to assembly that they were logically performed during assembly. . . .

(4) [W]hether economic or other practical considerations dictate that the operations be performed concurrently with assembly.

*Id.* at 506 & n. 7.

The Court of International Trade then analyzed Levi's claimed exemption in accordance with these factors. It initially determined that, under the first factor, the relative cost of 27% of total component cost and relative time of 1.1% of total assembly time indicated that the stonewashing process was incidental to the assembly process. *See Levi*, 969 F.Supp. at 79–80 However, the court concluded that the second factor weighed against granting the partial duty exemption because the stonewashing process was not necessary to the assembly process, but rather could have been conducted at other facilities, as was the case prior to May 1993. *See id.* at 79–80. The court reasoned that the third factor weighed in favor of granting the partial duty exemption because it would be logical to perform the stonewashing "at the situs of the assembly process where all other assembly and post-assembly steps are performed and where the trained personnel are located." *Id.* at 80. With regard to the fourth factor, the court determined that economic and practical considerations weighed in favor of granting the partial duty exemption, including Levi being able to detect and correct sewing and laundry defects more easily after assembly, producing more "first-quality"

garments, reducing the time to get the garments to the buyer, and saving on labor costs because there would be no need to unpack and repackage the garments. *See id.* at 80. Examining additional arguments, the court then rejected Customs's contention that permitting Levi this exemption would harm United States domestic industry. The court explained that it could find no support for the claim that the legislative intent of subheading 9802.00.80 was to protect domestic industry from domestic companies moving abroad, but rather found that it was enacted to allow, as here, domestically manufactured goods to compete with foreign-made goods. *See id.* at 80–81. Finally, the court found that the stonewashing process was analogous to cleaning and painting, which subheading 9802.00.80 specifically lists as minor, and comparable to "the curing operation which imparted crease retention and seam and surface flatness to men's pants" that was found minor and incidental in *Haggar Apparel Co. v. United States,* 938 F.Supp. 868 (Ct. Int'l Trade 1996), *aff'd,* 127 F.3d 1460 (Fed.Cir.1997), *petition for cert. filed,* 67 U.S.L.W. 3001 (June 18, 1998). *Levi,* 969 F.Supp. at 81. Thus, the court concluded that the *Mast* factors, as well as other considerations, weighed in favor of granting Levi the partial duty exemption.

## ANALYSIS

### I.

■ The government's initial and seemingly primary argument on appeal is that the Court of International Trade erred by failing to accord deference to the interpretation by Customs of the applicable HTSUS provisions pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In support of this argument the government points to the authority granted to Customs by 19 U.S.C. § 1500(b) (1994) to "fix the classification and rate of duty applicable to

such merchandise." Moreover, it further points to Customs's promulgation, under these and other authorities, of 19 C.F.R. § 10.16(c)(4) (1998), which provides, in relevant part, that "[t]he following are examples of operations not considered incidental to the assembly as provided under subheading 9802.00.00[:] ... (4) Chemical treatment of components or assembled articles to impart new characteristics, such as ... dying or bleaching of textiles."

We are somewhat perplexed as to why the government has chosen to appeal this issue because we are bound by precedent squarely rejecting the government's assertion of deference to Customs's regulatory interpretations of tariff classifications.[1] *See Haggar,* 127 F.3d at 1462 ("[T]he [Court of International Trade] properly rejected the United States' argument that Customs' regulations interpreting and applying this statute are entitled to deference under *Chevron.*"); *Rollerblade, Inc. v. United States,* 112 F.3d 481, 484 (Fed.Cir.1997) ("[N]o *Chevron* deference applies to classification decisions by Customs."); *Universal Elecs. Inc. v. United States,* 112 F.3d 488, 491 (Fed.Cir.1997) ("[N]either this court nor the Court of International Trade defers to Customs' interpretation of a tariff heading on the basis of special deference pursuant to *Chevron.*"). As we have explained, "the Court of International Trade's statutory mandate to find the correct result is logically incompatible with *Chevron* deference." *Rollerblade,* 112 F.3d at 484. *See generally* 28 U.S.C. § 2643(b) (1994) (charging the Court of International Trade with the duty "to reach the correct decision"). Thus, in accordance with our prior precedent, we reiterate that no *Chevron* deference is due to Customs's interpretations of the tariff statutes and we therefore hold that the Court of International Trade's review of Customs's determinations complied with that court's statutory mandate.

### II.

■ The government's second argument on appeal is that the Court of International

---

1. The government noted in its brief that, at the time of filing, it was considering whether to seek *in banc* review of *Haggar* or file a petition for a writ of certiorari and, therefore, "[i]n order to preserve our deference arguments, they must

also be set forth in this case." Br. for Def.-App. at 25 n. 16. We fail to comprehend how the government's arguments were in any sense "preserved" by making them here.

Trade misapplied the *Mast* factors and that the stonewashing here was not minor and incidental to the assembly process. We find no error of law in the court's application of the *Mast* factors and we conclude that the court's determination that the stonewashing was incidental to the assembly operation was not clearly erroneous. *See Universal Elecs.,* 112 F.3d at 493 ("[o]n appeal we review the Court of International Trade's factual findings—not those of Customs unless they coincide—for clear error. On questions of law, we defer to neither Customs' nor the Court of International Trade's interpretations; we decide such questions afresh." (Citation omitted)).

### (i) The relative cost and time comparisons

The government contends that the Court of International Trade's cost comparison was inconsistent with *General Motors Corp. v. United States,* 976 F.2d 716, 11 Fed. Cir. (T) 1 (Fed.Cir.1992) ("*GM*"). In *GM* we reversed the Court of International Trade's grant of a partial duty exemption on various sheet metal components to a U.S. automobile manufacturer. After being assembled into vehicles abroad, the vehicle bodies were subject to a finish painting process. *See id.* at 718, 11 Fed. Cir. (T) at 1–2. Central to our reversal was the Court of International Trade's failure to include in its cost analysis all paint shop operations, which included, not just topcoat painting, but also zinc phosphate spraying, submerging in an electro deposition primer tank, baking, sanding, sealant treating, applying surface primer, curing, and waxing. *See id.* at 718–20, 11 Fed. Cir. (T) at 2–5. There was no such error in the Court of International Trade's analysis here. With regard to operating costs, the Court of International Trade expressly took note of *GM* and in calculating the "wash cost" took account of all components that were stonewashed. It was not error for the court to exclude certain post-wash costs, such as packing and shipping, from its "wash cost" calculation because these costs, unlike the included costs in *GM,* were entirely separate from the stonewash operation.

We similarly conclude that there was no clear error in the Court of International Trade's comparison of capital costs. Subheading 9802.00.80 lists "washing" as an incidental operation. Thus, capital investment in washing machines would not appear to be outside of the subheading's ambit. In addition, unlike *GM,* the Court of International Trade appears to have taken proper account of depreciation costs.

With regard to the time comparison, the Court of International Trade found that the stonewashing process accounted for 1.1% of the total time, based upon a single pair of denim jeans taking nineteen minutes to assemble and 296 pairs of jeans taking ninety-nine minutes to wash. Although the government argues that the Court of International Trade failed to take labor time into account, we are not persuaded that the time spent loading and unloading the jeans from the washing machines was anything other than *de minimis* and thus would not impact the calculation in a significant manner. We are also unpersuaded by the government's argument that the Court of International Trade should not have divided the ninety-nine minute washing time by the 296 jeans, but rather should have regarded the washing time as ninety-nine minutes per pair. This argument ignores the reality that all 296 pairs of jeans were washed together and, indeed, had to be washed together if the abrasive process was to be successful. Thus, the Court of International Trade's time comparison was not clearly erroneous.

### (ii) The logic of performing the operations during assembly

The government argues that the stonewashing was not logically performed during the assembly process because it involved a different process (washing, rather than sewing) and different machinery (washing machines, rather than sewing machines). However, the government's argument appears to misconstrue this *Mast* factor. The appropriate inquiry is not whether the operation is somehow identical or nearly identical to assembly itself, but rather whether the relationship between the operation and assembly is such that force of logic suggests that the operation be performed as an incident to assembly. Here, there was substan-

tial evidence that the relationship between the stonewashing and the assembly of the jeans logically dictated that they be performed together. Thus, for example, certain paper tags and brand labels cannot be attached to the jeans prior to the stonewash because they would be mutilated by the stonewashing process. Accordingly, stonewashing the jeans at the point of assembly obviates the need to have a separate assembly staff elsewhere to attach these tags and labels. Moreover, it further obviates the need to pack the jeans for shipping only to have to unpack them elsewhere for stonewashing and attachment of tags and labels. Therefore, we conclude that the Court of International Trade's determination that this *Mast* factor weighed in Levi's favor was not clearly erroneous.

*(iii) Economic and other considerations*

■ As a threshold matter, we disagree with the government's contention that this fourth *Mast* factor "eviscerates" the purpose of subheading 9802.00.80 due to this factor supposedly permitting improper advancements in value. Advancements in value of the assembled merchandise are, of course, only permissible to the extent that they comply with the terms of subheading 9802.00.80. However, the question posed by this factor, whether there are economic or other practical justifications for performing the assembly operation abroad, is an entirely different question to whether the merchandise at issue has been subject to an improper advancement in value. Indeed, while the latter inquiry simply focuses on the value of the particular merchandise, the former looks more broadly to matters such as economic efficiency and general business strategy. Thus, we do not agree that this factor in any sense "eviscerates" the purpose of the subheading. In any event, *Mast* is binding precedent and we cannot revise it, except *in banc*.[2] See *South Corp. v. United States*, 690 F.2d 1368, 1370 n. 2, 215 USPQ 657, 658 n. 2 (Fed.Cir.1982) (*in banc*).

The Court of International Trade's determination that economic and other considerations weigh in favor of granting the partial duty exemption was not clearly erroneous. Indeed, evidence was presented that certain imperfections are only apparent after the stonewashing and that it is, therefore, convenient to have the repair department of the assembly plant on site to make these corrections. Moreover, if the jeans are stonewashed elsewhere, it is apparently more difficult to identify the party to be made financially responsible for any damaged jeans. There was also evidence presented that shipping the jeans back to the United States for stonewashing can cause delays of several weeks and cause additional labor costs because the jeans have to be unpacked in the United States and then, after the stonewash, repacked, inspected, and tagged for the market in the United States. Finally, we find no merit in the government's argument that the stonewashing process cannot be considered minor because senior Levi corporate officers are involved in selecting the colors and shades desired from the stonewash. Plainly, senior management will invariably be involved in broad decision-making regarding production facilities and the product line. Not surprisingly, there is no authority or precedent for the proposition that this somehow disqualifies an importation from the partial duty exemption.

Consequently, because the Court of International Trade's determinations regarding the three disputed *Mast* factors were not clearly erroneous, we do not disturb the court's overall weighing of the factors to determine that the stonewashing process was minor and incidental to assembly.

CONCLUSION

Because the Court of International Trade's non-deferential review of Customs's interpretation and determination complied with that court's statutory mandate and applied the correct law, and because the court's determination that the stonewashing process was

---

**2.** Of course, "we do not read *Mast* as announcing factors that must invariably be used to the exclusion of all others, or that all such factors are pertinent in every case involving [subheading 9802.00.80]." *GM*, 976 F.2d at 719-20, 11 Fed. Cir. (T) at 4.

minor and incidental to assembly was not clearly erroneous, we

*AFFIRM.*